**RICHARD SCOTT SAMSEL**                                    **PLAINTIFF**

**VS.**                                    **CAUSE NO. 3:14-CV-00113-MPM-SAA**

**DESOTO COUNTY SCHOOL DISTRICT;**
**ALLYSON KILLOUGH, in Her Individual**
**Capacity and Official Capacity; SUPERINTENDENT**
**MILTON KUYKENDALL**                                    **DEFENDANTS**

## ORDER

This cause comes before the court on the motion of defendants Desoto County School

District, Desoto County School District Superintendent Milton Kuykendall and Olive Branch

High School ("OBHS") Principal Allyson Killough, for summary judgment, pursuant to Fed. R.

Civ. P. 56. This court, having considered the memoranda and submissions of the parties,

concludes that the motion should be granted in part and denied in part.

## Introduction

This is a case, arising out of the firing of a high school football coach, which has aroused

passionate disagreement among Desoto County residents. This court's opinion today does not

attempt to answer the question of whether plaintiff's January 2014 firing as OBHS athletic

director and head football coach was the "correct" one. Rather, this court must decide a much

narrower issue: whether the decision to fire plaintiff was a lawful one. As discussed below,

plaintiff's contract with the school district allowed him to be terminated as coach and athletic

director even without good cause. Moreover, plaintiff offers insufficient proof that his firing

violated federal law, including provisions barring age discrimination and retaliation for engaging

1

in protected speech.  This court therefore concludes that plaintiff's claims arising out of his termination (and failure to be rehired) should be dismissed.  However, this court concludes that triable jury issues exist regarding plaintiff's state law defamation claim against Kuykendall, which it discusses below.

## Analysis

### I.  Does plaintiff have any federal claims arising out of his termination as athletic director and football coach?

Prior to discussing plaintiff's specific claims arising out of his termination (and failure to be rehired), this court will first evaluate some of the conflicting evidence in this case regarding exactly why he was fired as athletic director and coach at OBHS.  In their briefing, the parties spend considerable energy discussing whether  plaintiff was fired for, relatively speaking, more or less "noble" reasons.  This is unsurprising, since both sides understandably wish to be viewed as "wearing the white hat" in this case.  After carefully reviewing the record, however, this court harbors no suspicion that any legally-protected right was implicated by plaintiff's firing.  That being the case, this court will not engage in a lengthy discussion of whether plaintiff's firing was the result of a more laudable motive such as concerns about his job performance or a less laudable one such as small-town politics.  Neither conclusion would justify a federal court's interjecting itself into a school district's decision to fire a football coach operating under an at-will contract.  This court will, instead, focus on the legal requirements of the specific claims asserted by plaintiff and determine whether genuine issues of fact exist regarding those claims.

In seeking to justify their decision to fire plaintiff, defendants have submitted a lengthy

list of alleged misconduct and/or performance deficiencies on his part, to wit:

> Plaintiff, Scott Samsel, claims that the Defendants violated various state and federal laws by removing him as Head Football Coach and Athletic Director of the Olive Branch High School ("OBHS") and transferring him to another school within the DeSoto County School District (the "School District"). Samsel claims that his allegedly protected speech, association, and age were reasons for his removal; this is not true. In reality, Principal Allyson Killough decided to remove Samsel from his supplemental positions, which left his licensed teaching contract intact, based on information that he had engaged in multiple instances of misconduct. Killough believed that such misconduct, if allowed to continue, would undermine her authority and continue to disrupt the working and learning environment at OBHS. ***

> Killough decided to remove Samsel due to multiple issues reported by numerous individuals, including without limitation reports that Samsel: (1) made equipment purchases that violated the School District's policies; (2) used vulgar and offensive language to the football players and coaches to refer to Principal Killough; (3) interrupted a middle school football game to argue with the referees; (4) improperly used the school time and facilities for personal business; and (5) engaged in questionable conduct regarding the official athletic rules. Regardless of Samsel's protected conduct, the Defendants would have made the same decision to remove his supplemental duties and transfer him.

[Defendants' brief at 1-2].

> With regard to the third allegation, defendants write that:

> Shortly before Killough became Principal, she heard that Samsel had interrupted an Olive Branch Middle School football game to argue with the referees. According to witness reports, Samsel belligerently yelled at the referees and marched down to the field to argue with them about a call. Samsel, however, was not a coach of the middle school team. When the referees asked Samsel what gave him the right to question their calls, he responded that he was the Athletic Director of OBHS. The referees ejected Samsel from the game, and a police officer walked Samsel from the field.

[Defendants' brief at 4-5 (record citations omitted)]. Plaintiff has contested many of these

allegations, but this court's review of the record suggests that they may have considerable

substance. This court need not make a definitive finding in this regard since, once again, it is

3

presently concerned with the issue of whether federal law may have been implicated by plaintiff's firing, not whether he "got a raw deal" by being removed as AD and coach.

While defendants thus point to several instances of alleged misconduct by plaintiff, there is also evidence that other factors, including small-town politics, may have played a role as well.[1] In so concluding, this court finds plaintiff's deposition testimony to be particularly enlightening. Indeed, when given a chance at his deposition to speak freely regarding why he believed he was fired, plaintiff placed heavy emphasis on what appear to be issues of local and office politics. Most notably, plaintiff appeared to suggest that his firing was due, in large part, to the removal of his "lifetime friend" Kyle Brigance as OBHS principal near the start of the 2013 school year. [Samsel depo. at 20]. Plaintiff testified that, soon afterward (and apparently before Killough was even selected as the new principal in November), he began hearing rumors in the community that he would be next:

> A. [F]or a couple of months prior to December, all I'd heard or basically since from the time Brigance was removed, all I'd heard that I was next. And that was very distracting.
> Q. All you heard. When did those rumors start?
> A. Right after Brigance was removed.

[Samsel depo. at 61-62].

In his deposition, plaintiff was quite emphatic that there was a common public perception that his days as coach were numbered after his friend (and apparent protector) Brigance was removed as principal. For example, in discussing a meeting he had with the Olive Branch mayor shortly before he was fired, plaintiff testified that:

---

[1]In so stating, this court uses the term "politics" broadly, to encompass actions taken on the basis of personal relationships and loyalty.

4

Q. You didn't -- earlier in your testimony today you were talking about people coming to you and coming to others and expressing their concern that or stating that you would be next. You're the next to be fired and that sort of thing. So I'm wondering if you talked about those rumors with the mayor?

A. I don't remember that being a part of the conversation, but I know he was well aware of those rumors.

Q. How do you know he was well aware of those rumors?

A. Everybody was.

[Samsel depo. at 79].

This court finds plaintiff's deposition testimony to be quite interesting, since it suggests that there may have been factors at work in his termination which were known to the Olive Branch rumor mill but which are less than clear to this court. Whatever these factors might have been, plaintiff gave little, if any, indication that any federally-protected right was the reason for the common perception that he would be fired after Brigance's removal. As discussed below, plaintiff did testify that, after initially positive interactions between Killough and himself, their relationship soured after she had heard reports that he was not working well with "younger" coaches and that this gave her an age-based reason to want him fired. Assuming this actually occurred, however, it would have been well after Brigance's removal as principal. The same is true with regard to the alleged protected speech which, plaintiff contends, motivated his firing as football coach.

In light of the foregoing, this court can only regard plaintiff's testimony as harming his federal claims. This court notes parenthetically that, even if the removal of plaintiff's friend, Brigance, was a prime factor in his termination, this does not necessarily mean that it was unjustified. Indeed, as far as this court is aware, perhaps plaintiff would have been justifiably fired long ago if he had not had Brigance protecting him. Perhaps not. What does seem clear is

that the role Brigance's removal played in plaintiff's firing has no apparent connection to his federal claims.

In his deposition, plaintiff placed great emphasis upon, and was obviously aggrieved by, an alleged instance of office politics which, he clearly believes, factored into his termination. In particular, plaintiff testified that he believes that his former offensive line coach Jeremy Toungett, who replaced him as head coach, was making negative comments about him to Principal Killough in order to get him fired:

> Q. And do you know or do you think, do you have an idea of what Toungett was saying to Ms. Killough that you were doing?
> A. I have no idea.
> Q. But you had some suspicions about what he was saying?
> A. He is a master of manipulation.

[Samsel depo. at 55]. Plaintiff also testified that he believed that other members of the football staff were being influenced by Toungett to work against him:

> Q. Was there anyone else other than Toungett that you felt like was working against you, Gaspard or Pool or Goodwin?
> A. I think a lot of those guys were getting influenced by Jeremy Toungett.

[Samsel depo. at 54].

In his own deposition, Toungett acknowledged that he did make negative remarks about the state of the football program to Killough:

> Q. After Ms. Killough came as principal, did you make some criticisms of Coach Samsel to Ms. Killough?
> A. As far as the morale and singling somebody out, no. As far as the atmosphere back there, yes.

[Toungett depo. at 15]. Toungett was very hesitant to give specifics about the exact nature of the negative atmosphere which, in his view, prevailed on the football team, but he did testify:

A. That it was a pretty volatile situation. I mean, as far as no -- it was just a bad situation. I don't know how to elaborate on that. It was a bad situation.

[Toungett depo. at 18].

In his deposition, Toungett acknowledged that the football coaches' morale was hurt by the fact that, in losing five games the previous season, the football team had failed to meet expectations. He otherwise failed to provide specific reasons for the team's morale problems, however. Toungett testified that he was named the new head football coach shortly after plaintiff was fired:

Q. When she had these conversations with you about how are things going, was this after he had told you he'd been fired as athletic director or before?
A. It was before.
Q. And then after he was fired as athletic director, is the next thing that happened is you got a call from her saying that she had fired him as head coach and wanted to make you head coach?
A. Yes.

[Toungett depo. at 24-25]. This court is not in a position to judge Toungett's character, and it has no basis to determine whether or not he was working behind the scenes to get plaintiff fired so that he could become the new head coach. What is clear, however, is that this constitutes another alleged instance of local and/or office politics which has no apparent connection to any federally-protected right. Moreover, the fact that plaintiff himself clearly seems to believe that these matters of politics heavily influenced his firing can only be regarded as quite damaging to his federal claims.

In his deposition, plaintiff offered yet another instance of local politics which, he believes, factored in his termination, namely jealously between different parts of Desoto County. Plaintiff emphasized that Superintendent Kuykendall hailed from the western part of the county,

and he testified to his belief that jealousy of eastern Desoto County (where Olive Branch is located) was a factor in Kuykendall wanting to see him gone. Specifically, plaintiff testified that:

> Q: So if you have some opinion I suppose it would be appropriate to ask what your opinion is.
> A: Okay. That's pretty simple, I think there was a lot of jealousy in the county. I think there's been a history of jealousy between the western part of the county and the eastern part of the county. Mr. Kuykendall's roots are from the western part of the county. *** I think there are deep rooted political jealousies and political issues there between Mr. Kuykendall and Olive Branch and maybe even a board member or two.

[Samsel 2nd depo. at 286].

Thus, plaintiff appears to believe that Kuykendall did not want to see OBHS succeed in football and that, for that reason, he worked behind the scenes to have him fired. While plaintiff freely acknowledged that he had no actual proof that such is the case, he plainly believes it to have been a factor in his firing. In a broader sense, plaintiff's testimony confirms this court's overriding impression that, assuming that factors other than genuine concerns about his job performance motivated his firing, these factors involved issues which had nothing to do with either federal or state law. Having discussed some of its general impressions regarding the proof relating to the reason for plaintiff's termination, this court now proceeds to a discussion of the specific claims which plaintiff asserts in this case.

**Age Discrimination**

This court first considers plaintiff's ADEA claim, in which he alleges that his age (fifty-two) was the but-for cause of his termination as AD and head football coach. Samsel offers no

direct evidence of age discrimination in this case, and he therefore relies upon the familiar *McDonnell Douglas* framework to meet his burden of proving his case at the summary judgment stage. It is well settled that

> [a] plaintiff relying on circumstantial evidence must put forth a *prima facie* case, at which point the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the employment decision. If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual.

*Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citations omitted). To establish an age discrimination claim under the ADEA, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Moss*, 610 F.3d at 922 (quoting *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009)).

Defendants do not dispute that plaintiff is able to make a *prima facie* case of discrimination, and this court will therefore consider the issue of whether their "legitimate, nondiscriminatory reason for the employment decision" is pretextual. Importantly, to prove that a reason given was pretext for discrimination, Samsel must submit evidence "both that the reason was false, and that discrimination was the real reason." *Holliday v. Commonwealth Brands, Inc.*, 483 Fed. Appx. 917, 921 (5th Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). This court has previously quoted the job performance issues which, defendants contend, motivated plaintiff's firing, and it has likewise discussed the political factors which, plaintiff testified, played a role his removal as AD and coach.

From reading plaintiff's brief, it appears that he strains to find any evidence of age-related

animus in this case.  When questioned regarding this issue at his deposition, plaintiff testified that:

> Q: During these meetings, did Ms. Killough ever say that she was letting you go because of your age?
> A. Not in those exact words, no.
> Q. Did she use any other words that would suggest that your age was the reason?
> A. I think the not being able to relate to some of the younger coaches was where that was implied.  And also, you know, if you look at who she replaced me with. They're all young, inexperienced guys that had no experience doing what they do at a school.

[Plaintiff's depo. at 180].  It appears that this is, essentially, plaintiff's primary "evidence" of age discrimination in this case.  Once again, however, plaintiff must create fact issues regarding whether age was the "but for" cause of his termination, and this court has previously noted the many political factors which he himself cited as contributing to his termination, which had nothing to do with his age.

Plaintiff cites Killough's alleged concerns about his working with "younger" coaches as supporting his termination, but this court does not believe that this constitutes proof of age discrimination at all.  Indeed, even accepting plaintiff's (rather self-serving) interpretation of Killough's beliefs as accurate, an ability to "relate to" and work well with younger employees does not fit within the quite narrow scope of compensable age-based animus, as established by U.S. Supreme Court precedent.  Indeed, in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701 (1993) the Supreme Court emphasized that the ADEA was enacted in reaction to stereotypical beliefs among some employers regarding the notion that an individual's competence and work performance decline with age.  Specifically, the Supreme Court wrote that:

> It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old

age.  As we explained in *EEOC v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75
L.Ed.2d 18 (1983), Congress' promulgation of the ADEA was prompted by its
concern that older workers were being deprived of employment on the basis of
inaccurate and stigmatizing stereotypes.

*Hazen Paper*, 507 U.S. at 610, 113 S.Ct. 1701.

The Supreme Court thus emphasized that the ADEA was enacted to combat employment

decisions made on the basis of certain specific stereotypical views regarding older workers.  The

Court hastened to add, however, that other factors which are merely "correlated" with age, such

as pension status, may not serve as the basis for an ADEA claim, writing that:

When the employer's decision is wholly motivated by factors other than age, the
problem of inaccurate and stigmatizing stereotypes disappears. This is true even if
the motivating factor is correlated with age, as pension status typically is.

*Id.* at 611, 113 S.Ct. 1701.  It is not clear to this court that an inability to work effectively with

younger workers is even "correlated" with age; it could just as easily be argued that age gives one

perspective regarding the need to work well with individuals of all ages.

Even assuming for the sake of argument that there is a correlation between advancing age

and an inability to deal effectively with younger workers, then this clearly does not fall within the

rather narrow scope of compensable age-based animus, as set forth in *Hazen Paper*.  It strikes

this court that, in a head football coach, an inability to relate to, and work well with, younger

assistant coaches is simply a leadership defect which constitutes an entirely proper basis for an

employer to wish to fire him.  This court certainly does not believe that it constitutes a basis for

the head coach to claim a defense to termination under the ADEA.  In this case, plaintiff's

reference to "younger" assistant coaches may include Toungett and Gaspard,[2] and both of these

---

[2]According to plaintiff's brief, Toungett was thirty-five years old, and Gaspard was fifty-
one years old (i.e., one year younger than plaintiff).

coaches made it clear that they informed Killough of serious issues with the state of the football program, not simply that plaintiff did not "relate well" to them. In the court's view, plaintiff should not be rewarded for these alleged deficiencies even assuming that the coaches who reported them happened to be younger. Once again, plaintiff suggested in his deposition that Toungett fabricated accusations against him in order to take his job. Even assuming that this is true, however, it nevertheless weakens plaintiff's ADEA claims, since a genuine, yet mistaken, belief on Killough's part that plaintiff was showing poor leadership and fostering dissension among his assistant coaches, young or old, may not serve as the basis for an ADEA claim.

Thus, even if plaintiff's testimony regarding Killough's reasons for firing him are correct, this court does not regard them as proof of age-based animus on her part. This court also notes that the timing of the events in this case, as described by plaintiff, casts further doubt upon his claims. In so stating, this court emphasizes that plaintiff testified that his initial meetings with Killough as principal were quite positive ones. In his brief, for example, plaintiff states that:

> Defendant Killough had two (2) early meetings with Samsel, one in November, and the second in December. At the November meeting, Defendant Killough praised Samsel's performance and stated she knew how important athletic teams were. Defendant Killough assured Samsel she would make no changes in the way he operated the athletic program and praised his success. At the December meeting, Defendant Killough again praised Samsel's accomplishments.

[Plaintiff's brief at 2-3]. Plaintiff appears to assert that "something happened" to sour Killough's views towards him between the December meeting and his subsequent firing in mid-January. What exactly that might be appears to depend upon which of his claims plaintiff is advancing at a particular time, but, in the ADEA section of his brief, he contends that it was because Killough learned that he wasn't working well with younger coaches. Under this theory, Killough would

have decided to fire plaintiff in late December and early January, and yet plaintiff himself testified that he, and many others in the community, believed that his days were numbered after his friend Brigance was removed as principal. That was, of course, even before Killough was hired as principal.

There is thus a clear internal inconsistency between plaintiff's many theories regarding why he was fired. At this juncture, this court must consider the facts in the light most favorable to plaintiff, but the coherence of his disparate claims greatly suffers when he advances one theory of his termination in one section of his deposition or brief, and then proceeds to an entirely inconsistent one in another. Plaintiff's age discrimination claims are also competing, in a causation sense, with his First Amendment retaliation claims, discussed below, in which he alleges that certain statements he made regarding the running of the football team and regarding school-related matters led to his termination as well. There is, in this court's view, simply not enough oxygen in the room for plaintiff's ADEA claims to survive alongside the many other reasons he himself cites as motivating his termination, particularly under the "but for" causation standard applicable to his age discrimination claims.

In arguing that fact issues exist in this regard, plaintiff relies heavily upon a tape recording of the January 13, 2014 meeting between Killough and himself which preceded his removal as AD, which, he argues, establishes that defendants' stated reasons for firing him are pretextual. As discussed below, this court agrees with plaintiff that the recording may serve as evidence of pretext, but not for age discrimination. In his brief, plaintiff describes a portion of this tape, which occurs at the end of the meeting and which includes statements from both Killough and assistant principal Mike Murphy, as follows:

Defendant Killough obviously forgot to turn off the tape-recorder when Samsel left the meeting, and the conversation continued as follows:

MR. MURPHY: That was a great Oscar you just earned.

MS. KILLOUGH: It went a lot smoother than I thought.

MR. MURPHY: It did but he almost cried about four times. He was seething. You couldn't see his seat on the side. He was seething. That's a good word to use. It was the best we could expect under the circumstances and the parameters that Kuykendall put you in.

MS. KILLOUGH: Right.

MR. MURPHY: When you told him about that, he was holding it in, Ms. Killough. Had you been a little nastier, he might have blown, but you outfoxed him on that. He was holding it in. I could see gritting the teeth, the body language. I was just waiting for him to unleash. I kept having my radio, that may have been too obvious.

MS. KILLOUGH: There were a couple of times I don't think I got it recorded all the way because it's not on anymore.

MR. MURPHY: I do.

MS. KILLOUGH: Do you really? (Laughter)

MR. MURPHY: I do. I'm sitting right next to him too and then I'm going to stop.

[Plaintiff's brief at 11, quoting Tape Transcript, pp. 61-62].

While this recording is open to differing interpretations, this court believes that plaintiff offers one arguable theory for its significance:

> If Murphy thinks Defendant Killough should have gotten an "Oscar" for her performance, a jury may infer her whole performance was an act undertaken in order to stir up anger in Samsel so as to give some reason to remove him as athletic director. Indeed, the School Board president has testified that the superintendent told him that reason for the employment action against Samsel was Samsel's becoming angry at a meeting with the principal. Nichols depo., pp. 8-9. Further, a jury may find that the January 13, 2014 [meeting] to "consider" removing Samsel as athletic director was a ruse since Killough had already decided to remove him by January 9, 2014.

[Plaintiff's brief at 11]. Thus, plaintiff argues that the tape recording suggests that Kuykendall and Killough used the meeting as an attempt to make him angry so that they could have a reason to fire him. Given the nature of the recording, this court believes that plaintiff has a legitimate argument in this regard.

14

At the same time, it is crucial to recognize that, to establish that a reason given was pretext for discrimination, plaintiff must show "both that the reason was false, and that discrimination was the real reason." *Holliday*, 483 Fed. Appx. at 921. In arguing that the tape recording demonstrates pretext for age discrimination, this court believes that plaintiff is his own worst enemy. As quoted previously, when asked in his second deposition why Kuykendall would have coached Killough to fire him, plaintiff responded that, in his opinion, it was because of jealousy issues between the eastern and western parts of DeSoto County. Moreover, the other reasons which plaintiff cited in his deposition as motivating his firing, quoted previously, largely involved issues of local and office politics which have nothing to do with age discrimination.

This court also notes that the circumstantial evidence of age discrimination in this case is quite weak. While plaintiff's replacement Toungett was, in fact, less than forty years of age, he himself only lasted a year as OBHS's head football coach, before being replaced by Steve Buckley, who was fifty-one years old. While that is sufficient to meet plaintiff's *prima facie* case of age discrimination, it is only barely so. Moreover, to reiterate, plaintiff contends that Toungett got his job partly by making false accusations against him to Principal Killough. If true, such scheming on the part of Toungett would certainly be reprehensible, but it would have nothing to do with age discrimination.

From carefully reviewing the record, this court believes that there is a much more plausible explanation for "what happened" to sour Killough's view towards plaintiff after her initially positive meetings with him. Simply stated, it seems clear from the record that, at some point after she was hired, Killough came to believe that plaintiff was trying to undermine her authority, if not to have her fired outright as principal. This evident belief strikes this court as

15

reasonable under the circumstances. Once again, plaintiff testified in his deposition that he, and much of the community, believed that his days as head coach were numbered once his friend Brigance was removed as OBHS principal. Moreover, it seems clear from the record that plaintiff had his own supporters in the community, which is unsurprising for a head football coach who had enjoyed considerable on-field success. Under these circumstances, it strikes this court as quite realistic to believe that a head coach in plaintiff's position might choose not to go quietly into the night, but instead choose to rally his supporters to save his job.

It appears to this court that the "triggering" event which led to clear animosity between plaintiff and Killough may have been a December 2013 meeting at which she overruled certain team-related decisions he made. It appears that, once this meeting occurred, plaintiff's generalized belief that his job was threatened may have coalesced into a firmer conviction that Killough was, in fact, "out for his job." Regardless of whether this is, in fact, the exact moment in which plaintiff's relationship with Killough degenerated into mutual suspicion and hostility, it seems quite clear from the record that it occurred (at least with regard to Killough) at some point by the January 13, 2014 meeting. As noted previously, plaintiff's testimony suggests that he believes that his assistant Toungett was a third party in this intra-school fight, which allegedly had him serving in the role of a Brutus eager to stab his head coach in the back in the interests of taking his job. Whether or not this is, in fact, how the events in this case played out, it seems quite clear from the record that Killough *believed*, by the January 13 meeting, that plaintiff was trying to get her fired.

Killough openly acknowledges that her belief that plaintiff was agitating against her was a reason for his termination. Unsurprisingly, however, Killough appeared eager to find additional

reasons for terminating plaintiff which would not be regarded as simply her acting to vindicate her authority as principal and ensure her own job security. This court frankly believes that this is where any actual pretext in this case may lie. Killough may believe that a power struggle between herself and plaintiff is a less "noble" reason for firing him than genuine concerns about how good an AD and football coach he was. From this court's perspective, however, it is largely immaterial whether the reasons for firing plaintiff were "noble" or not. The question is whether those reasons were lawful. It seems clear to this court that, from Killough's perspective as principal, plaintiff's perceived actions represented simple insubordination which constituted an entirely lawful reason for his termination.

The fact that Killough believed, by the time of the January 13 meeting, that her own job was at stake seems clear enough from the transcript of the meeting. This transcript quotes Killough as confronting plaintiff with the following accusation:

> MS. KILLOUGH: Good. Also [it has] been brought to my attention that you have gone to the Mayor Scott Phillips; that you told him you need me fired, you're ready to start your separate school district. I don't know what I'm doing, I'm an idiot, I should have never been hired.
> MR. SAMSEL: No.
> MS. KILLOUGH: Didn't happen, good.

[Transcript of Jan. 13th meeting at 16].

There is additional evidence in the record supporting a conclusion that, by the January 13 meeting, Killough genuinely believed that plaintiff was seeking to rally support in the community against her. In her declaration, Killough asserts that, at some point after she became principal, she was told by Gaspard that plaintiff had been making vulgar remarks about her to the football team and that he had encouraged his players to "tell their parents that I did not support the

football team and was trying to ruin the program." [Killough Declaration at 3].

In his deposition, Gaspard confirmed Killough's account, describing plaintiff's statement to the team, at some point in December 2013, as follows:

> A: He came in and he was upset. I don't know what happened before. And he just said, told the kids tell their parents that the bitch up front is trying to ruin the program that we started.

[Gaspard dep. at 28-29]. Gaspard confirmed that he told Killough about plaintiff's alleged remarks, and it is thus apparent that, at the time of the January 13 meeting, she had reasonable cause to believe that plaintiff was seeking to rally support in the community against her. This court notes that plaintiff has submitted evidence from several football team members denying that they heard him make the alleged derogatory remarks about Killough.[3] For the purpose of evaluating Killough's motives and conduct at the January 13 meeting, however, the crucial fact is that she had reasonable cause to *believe* that plaintiff was agitating against her, regardless of whether he actually was or not. Indeed, while Toungett seemed, as noted previously, quite hesitant to give specifics about what he told Killough about the negative "atmosphere" on the team, plaintiff himself testified that he believed that Toungett was making negative remarks about him to the principal.

---

[3]However, even some of the witnesses who plaintiff quotes in his briefing did appear to provide adverse testimony against him. For example, plaintiff's brief quotes at length from the deposition of football team member Demetrius Harris, who stated that he had no recollection of Samsel having used the word "bitch" to refer to Killough during the controversial team meeting. [Plaintiff's brief at 8-10]. Harris did testify, however, that he had told Gaspard that he recalled Samsel "going off and stuff" in the meeting with the team. In this court's view, this testimony tends to support a conclusion that there was, in fact, a team meeting at which Samsel made angry remarks about Killough, even assuming that he did not call her a "bitch." In the court's view, Killlough could very reasonably consider Samsel's angrily questioning her leadership in front of his team to be insubordination.

As discussed below, plaintiff asserts First Amendment retaliation claims in which he maintains that he was fired for his "association" with members of the community. Plaintiff is not at all eager to go into details regarding exactly what sort of associations he might have had in this regard, but it seems clear to this court that Killough (reasonably) believed that those associations involved plaintiff attempting to marshal his supporters in the community to ensure that he would come out on top in what he may have perceived as a power struggle between himself and his principal. In his deposition, plaintiff conceded that Killough had raised concerns with him that he was trying to marshal community support against her. Specifically, plaintiff testified that:

> Q: It looks to me like you identify that issue that happened January 24th, I think, 2014, that you're claiming that you were connected with persons who made adverse social media comments about her as an associational claim under the First Amendment.
> A. She accused me of having something to do with negative comments about her on social media.
> Q. Okay.
> A. And she also accused me of organizing a rally.

[Samsel depo. at 77-78].

The question thus arises: is it more plausible to believe that Killough's view towards plaintiff worsened because she had learned that he did not "relate well" to younger coaches or because she had come to believe that he was rallying his supporters in the community to try and have her fired? The question largely answers itself. Plaintiff had certainly not aged more than a few weeks from the time of his initially positive meetings with Killough. This court recognizes that the tape recording of the January 13 meeting arguably casts Killough in a negative light, since, considered in the light most favorable to plaintiff, it suggests that she may have been seeking to goad him into losing his temper. This might well serve as evidence of pretext for age

discrimination, in a case where plaintiff had even some evidence that he was fired because of his age. In this case, however, this court sees no indication whatsoever that age-related concerns were even a motivating factor, much less a but-for cause, of his termination.

This court does agree with plaintiff that the January 13 recording constitutes evidence that, by that date, Killough was determined to have plaintiff fired and that she was trying to place him in a position where he would give her additional reasons to do so. The first fact is not even in dispute, however, and this court accordingly does not regard the tape recording as constituting as strong a piece of evidence as plaintiff does. Indeed, Killough openly admits in her declaration that, due to performance-based reasons set forth therein, that she had decided to fire plaintiff as AD and head coach by January 9, 2014 at the very latest:

> 11. Throughout December and January, I spoke with my Assistant Principals, Mike Murphy, Sid McNeil, and Todd Nichols, about the reported conduct and my concerns regarding Samsel. Everyone agreed that Samsel was causing disruption to and hostility in the working and learning environment, rather than performing his duties as Athletic Director. The consensus was that I should remove him as Athletic Director and Head Football Coach.

> 12. On January 9, I sent an e-mail to Van Alexander, the Associate Superintendent of Personnel, stating that I wanted to discuss my decision to remove Samsel as Athletic Director and Head Football Coach.

[Killough Declaration at 4].

Killough further states in her declaration that she discussed her determination to fire plaintiff with Superintendent Kuykendall, as well as legal counsel. According to Killough, Kuykendall indicated that he would support whatever decision she made but that he recommended first removing plaintiff as Athletic Director only. [Id]. Killough asserts that, after considering plaintiff's verbal and written responses to the accusations she leveled against him at

the January 13 meeting, she gave him a "two week notice that his supplemental contracts for his Athletic Director duties were being canceled." [Id. at 5]. In so stating, Killough notes that "my understanding of supplemental contracts is that they can be cancelled at any time, for any reason, by either party upon providing two (2) weeks notice." As discussed below, the language of plaintiff's contracts supports her conclusion in this regard.

Killough asserts that, after removing plaintiff as AD, his performance did not improve. To the contrary, Killough noted her belief that plaintiff had been communicating with individuals on social media who were critical of her and supportive of him. Specifically, Killough states that:

> 18. I became aware of posts on the "OB Nation" Facebook page, which I understood is operating by Lisa Ransom and other unknown individuals.[4] The things being reported involved topics that I discussed with Samsel on January 13th (e.g. Samsel using the school's washer and dryer to do his personal laundry). An OBHS student showed me text messages that Ransom sent her requesting that she participate in activities to support Samsel.

[Id. at 5-6]. Killough asserts in her declaration that, based on these and other factors, she met again with Kuykendall and others, told them that plaintiff's attitude had actually gotten worse and advised them that she planned to remove him as head coach. [Id. at 6]. Kuykendall indicated that he would support her in this decision.

Considered in light of these facts, this court does not regard the tape recording of the January 13 meeting as being as damaging as plaintiff contends. In so stating, the court first emphasizes that plaintiff argues in a different section of his brief that the holding of a "show

---

[4]This court notes that it visited the website in question in March 2017. At the time of this court's visit, the website still contained an advertisement for a January 24, 2014 benefit concert in support of Coach Samsel.

cause" hearing was not only proper but *constitutionally required*. This contradiction is typical of the manner in which plaintiff manages to argue one theory of the case in one section of his brief and then argue something entirely different in another. While this court does not believe that a show cause hearing was constitutionally required, for the reasons discussed below, it does consider it entirely fair and proper that Killough gave plaintiff an opportunity to answer the charges against him.

This court therefore regards the holding of the January 13 meeting as being a laudable step, and plaintiff's argument that the tape recording supports his claims comes down to the rather subjective evidence of the *manner* in which it was held. In this vein, however, this court notes that the most damaging statements in the recording were made by Assistant Principal Murphy, not Killough. In particular, Murphy's statement to Killough that "[t]hat was a great Oscar you just earned" does tend to cast her in a negative light, since it arguably suggests she was putting on a performance and was not sincere in what she said. That is merely Murphy's (rather unfortunate) choice of words, however, rather than Killough's own description of her intent and state of mind.

In the court's view, the recording would be stronger evidence of pretext if Killough, and not Murphy, had made the statements in question. Moreover, this court does not believe that the nefarious nature of defendants' tactics at the January 13 meeting should be overstated, even if plaintiff's theory of what motivated Killough is correct. Plaintiff's reaction to the accusations made against him at the January 13 meeting was a matter within his control, and, even if Killough was attempting to make him lose his temper, it was ultimately his choice whether he did so or not. Thus, this court does not regard Killough's alleged "performance" (which simply

reflects Murphy's characterization of her actions) at the meeting to constitute fabrication of evidence against plaintiff, or similar misconduct.

Nevertheless, this court does, once again, accept the recording as evidence of pretext, but, for the reasons previously stated, it does not regard it as evidence of pretext for age discrimination. This court additionally notes that many of the performance-based reasons cited by defendants for terminating plaintiff appear to be cause for serious concern, including the aforementioned incident in which plaintiff was escorted from a middle school football game by police, after arguing with officials over a call in a game in which he was not even acting as coach. Killough testified that she was well aware of this incident even before she became principal, and this court believes that it raises legitimate questions about plaintiff's temperament. Indeed, the record contains a number of references to plaintiff potentially having temper issues, and this may well have given rise to a hope (and expectation) on the part of Killough and Kuykendall that plaintiff would "lose it" at the January 13 meeting.

As quoted previously, Murphy made references that seem to indicate that plaintiff did, in fact, come close to losing his temper at the meeting. Moreover, plaintiff emphasizes that Kuykendall asserted at a school board meeting that plaintiff did, in fact, lose his temper at the meeting and that this was a reason for his firing. This further buttresses this court's conclusion that the tape recording constitutes valid evidence of pretext, but, at the end of the day, ADEA claims still require proof of age discrimination. Having carefully considered the record, this court can find no such evidence in this case, much less evidence that might lead a jury to conclude that age was a "but for" cause of his firing. This court therefore concludes that plaintiff's ADEA claims are due to be dismissed, and it will turn to the next federal claim

asserted by plaintiff.

**First Amendment Retaliation**

The court next addresses plaintiff's First Amendment retaliation claims in this case. As discussed below, most of these claims fail to even leave the starting gate, due to plaintiff's reluctance to state, with any degree of specificity, in exactly what protected speech and/or associations he engaged in this case. In employment discrimination cases, a court must approach First Amendment retaliation claims with great caution, since there are many forms of speech which might be considered protected activity when spoken by a non-employee but which enjoy no protection whatsoever when spoken by an employee. Indeed, the U.S. Supreme Court has established quite stringent standards applicable in cases where an employee argues that he was terminated in retaliation for First Amendment-protected activity. It is well settled that "when a public employee speaks pursuant to [his] official duties, [he] does not speak as a citizen and [his] statements are not entitled to constitutional protection." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Moreover, even when an employee does speak as a citizen on a matter of public concern, he might lack constitutional protection for such statements, if they tend to unduly harm the efficient operations of the governmental defendant. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731 (1968); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684 (1983).

Thus, even if this court were to find that Samsel engaged in protected speech and/or association, then it must still be determined whether his interest in the protected conduct outweighed the school district's interest in the efficiency of its operations. *Reyes v. Weslaco*

*Indep. Sch. Dist.*, 354 Fed. Appx. 904, 906-907 (5th Cir. 2009). To make that determination, this court must engage in the *Pickering-Connick* balancing test, which considers the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." *Id.* (quoting *Connick*, 461 U.S. at 150). In applying this test, this court must consider:

> (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or insubordinate; (5) whether the activity impairs discipline by superiors or harmony among coworkers.

*Id.* (quoting *Brady v. Fort Bend County*, 145 F.3d 691, 707 (5th Cir. 1998).

Plaintiff correctly notes that, in one respect, his burden in the First Amendment retaliation context is less stringent than in the ADEA context. That is, to meet the relevant causation standard, a First Amendment retaliation plaintiff need to show only that his speech was a "motivating factor or substantial factor" in the employment decision. *Mt. Healthy City School District Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff does, in fact, demonstrate that his speech was a substantial factor in the adverse employment action taken against him, there is no constitutional violation if the defendant can show both (i) that it would have taken the same action in any event, and (ii) that it would have taken that action for reasons that are not unconstitutional. *Mt. Healthy*, 429 U.S. at 286–87.

While the *Mt. Healthy* "mixed motive" option lessens the burden of First Amendment retaliation plaintiffs somewhat, the Supreme Court's body of law in this context is, on balance,

quite stringent. It appears to this court that, by being deliberately vague regarding in exactly what First Amendment-protected speech he engaged in this case, plaintiff is seeking to avoid subjecting his speech to these stringent requirements. Obviously, such a tactic cannot succeed. That being said, this court does believe that there is substantial evidence in the record that the school district terminated plaintiff partly, if not largely, on the basis of its *belief* regarding things that he said and/or associations that he had. In this sense, plaintiff's First Amendment retaliation claims are quite different from his ADEA claims, since this court sees no evidence whatsoever in the record that age was even a motivating factor for plaintiff's firing. Nevertheless, this court finds that plaintiff's First Amendment retaliation claims clearly lack merit, since the things that the school district *believed* that he said (correctly or not) and which potentially contributed to his firing, constituted self-serving advocacy for plaintiff's own personal interests and/or simple insubordination. Neither of these are protected by the First Amendment.

Moreover, plaintiff fails to offer proof, or even specific allegations, regarding any other activity he might have engaged in which enjoys First Amendment protection and which might even potentially have contributed to his firing. Thus, to some extent, this court is forced to argue with itself on this issue, even though it should arguably simply dismiss plaintiff's First Amendment claims outright. Out of an abundance of caution, however, this court will discuss them in some detail.

Once again, for plaintiff's speech to be protected, the Court must first determine that he spoke as a citizen on a matter of public concern. *Garcetti*, 547 U.S. at 418. Importantly, whether a plaintiff spoke as an employee or as a citizen on a matter of public concern is a question of law, and, as such, this court may not simply pass these issues on to a jury based upon the vagueness of

the First Amendment allegations in this case. *Graziosi v. City of Greenville,* 775 F.3d 731, 736 (5th Cir. 2015). "An employee is not speaking as a citizen—but rather in his role as an employee—when he 'makes statements pursuant to his official duties.'" *Haverda v. Hays County*, 723 F.3d 586, 598 (5th Cir. 2013) (quoting *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007). "Even if the speech at issue is not required by the employee's job, the speech may not be protected if it was made while performing the job or to fulfill the job's responsibilities." *Brown v. North Panola Sch. Dist.,* 2010 U.S. Dist. LEXIS 76419, *12 (N.D. Miss. July 28, 2010) (citing *Williams v. Indep. Sch. Dist.,* 480 F.3d 689, 692 (5th Cir. 2007)). According to the Fifth Circuit, "[s]peech involves a matter of public concern if it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Graziosi*, 775 F.3d at 738 (5th Cir. 2015) (quoting *Connick*, 461 U.S. at 146).

Based upon this authority, this court concludes that none of plaintiff's speech which might even potentially have led to his termination was protected by the First Amendment. While plaintiff's allegations in this context are, to reiterate, quite vague, at least some of the alleged speech which might have led to his firing related to the proper management of a high school football team. As noted previously, for example, Coach Gaspard testified that plaintiff told the football team "to tell their parents that the bitch up front is trying to ruin the program that we started" and that he relayed these comments to Killough. This strikes this court as being a quite plausible reason for Killough to have wanted to fire plaintiff. In his complaint, plaintiff also cites certain statements he made to Killough during their private meetings, in which they discussed team-related issues.

It is unclear to this court whether speech regarding the management of a sports team

might be properly considered a "matter of political, social, or other concern to the community" within the meaning of *Graziosi*, and it will accordingly not rule on this basis. Regardless, even assuming that a member of the public might be able to assert a First Amendment retaliation claim based on statements about the mis-management of a sports team, it concludes that plaintiff may not do so, under the facts of this case. In so stating, this court notes that the Fifth Circuit held in *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) that a head football coach/athletic director's communications to his principal regarding athletic finances, including statements that the school's allocations "hurt [his] ability to provide . . . student/athletes with critical items and/or materials necessary for competition" were not protected by the First Amendment. In so holding, the Fifth Circuit appeared to assume that such statements might be a matter of public interest if spoken by a non-employee, but it held that they were made by the plaintiff in his capacity as head coach and were thus not protected under *Garcetti*. *Williams*, 480 F.3d at 692-93.

Clearly, *Williams* constitutes adverse authority for plaintiff in this case, and it is consistent with the Fifth Circuit's conclusion that "the mere insertion of a scintilla of speech regarding a public concern" is not sufficient to "make a federal case out of a wholly private matter fueled by private, non-public interests." *Teague v. City of Flower Mound*, 179 F.3d 377, 381-83 (5th Cir. 1999). In *Teague*, the Fifth Circuit held that speech regarding a matter of public concern (i.e., police misconduct) which was made by an officer in the context of a grievance with his employer did not enjoy constitutional protection. *Id.* at 383. It strikes this court that *Teague* and similar holdings may be motivated, at least partly, by a conclusion that alleged First Amendment activity by employees who believe that their job is threatened must be regarded with

caution. Indeed, if such caution were not present, then threatened employees might well be encouraged to "lash out" against their employers by making statements of alleged public interest, in the interests of manufacturing a potential First Amendment retaliation claim and saving their jobs.

In this case, it seems clear that plaintiff's statements regarding the management of the football team (both to Killough and to the team) were made, if at all, in his capacity as head coach and that they were fueled by his own private interests, in particular protecting his own professional authority and saving his job. As noted previously, plaintiff made it very clear that he believed that once his friend Brigance was fired as OBHS principal, efforts would be made to fire him. Accordingly, it appears to this court that, once Killough was hired, plaintiff's posture became largely one of professional self-preservation. Plaintiff's alleged statements to the football team were apparently in response to a meeting between Killough and plaintiff, shortly after he was hired, in which she limited his ability to hire assistant coaches. It seems clear from the record that plaintiff regarded Killough's decision as limiting his authority to run the football team as he saw fit, if not confirmation of the fact that Killough was, in fact, part of the political forces in the community aligned against him. Plaintiff, thus had a personal stake in the management of the football team, even assuming for the sake of argument that such management might be considered a matter of public interest, if spoken by someone without such an interest.

The court therefore concludes that, from plaintiff's perspective, his alleged statements to the football team involved "a wholly private matter fueled by private, non-public interests" within the meaning of *Teague*. Even assuming *arguendo* that this conclusion is somehow incorrect and that the issue of the proper management of the football team was one of public

interest, even when spoken by plaintiff, the fact remains that he was plainly speaking in his capacity as head football coach when he made the statements which Gaspard alleges. Indeed, it would be difficult to argue that a head coach addressing members of his team on school premises did *not* act in his official capacity in doing so, and plaintiff thus clearly fails to meet the requirements of *Garcetti* on this issue.

Of course, it could be argued that, since plaintiff denies even making the derogatory statement to the football team, this court should not even consider it. This argument raises the rather interesting question of whether a public employer's firing of an employee based upon the *mistaken* belief that he engaged in protected speech would be actionable in a First Amendment retaliation lawsuit. This court's research indicates that the federal circuits are split on this issue. In-chambers research suggests that at least three federal circuits are of the view that a mistaken belief that a plaintiff engaged in protected activity may give rise to a First Amendment retaliation lawsuit. *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 299-300 (6th Cir. 2012), *Welch v. Ciampa*, 542 F.3d 927, 939 (1st Cir. 2008), and *Gann v. Cline*, 519 F.3d 1090, 1094 (10th Cir. 2008). More federal circuits have reached a contrary conclusion, however, holding that there can be no First Amendment cause of action where there was no speech by the plaintiff. *Fogarty v. Boles*, 121 F.3d 886, 890–91 (3d Cir.1997); *Barkoo v. Melby*, 901 F.2d 613, 619 (7th Cir. 1990); *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 495 (3d Cir. 2002); *Wasson v. Sonoma Cnty. Junior Coll.*, 203 F.3d 659, 662 (9th Cir. 2000).

Unfortunately for plaintiff, the Fifth Circuit has adopted the latter view. *See Jones v. Collins*, 132 F.3d 1048, 1053 (5th Cir.1998). In *Jones*, the Fifth Circuit concluded that the plaintiff could not seek recovery based upon her employer's mistaken belief about her public

comments, writing that:

> In this case, Jones contends that she never made any public comment about the prospect of placing the alternative education program on the Dunbar campus and that Jones retaliated against her based upon his perception that she spoke out negatively regarding this matter. Assuming for the sake of argument that Jones's expression as perceived by Collins would have been subject to constitutional protection (i.e., the negative comments perceived by Collins related to a matter of public concern and Jones's interest in making them outweighed TISD's interest in efficiently providing educational services), retaliation based on this perception, in the absence of any actual expression by Jones that is subject to First Amendment protection, does not constitute a constitutional violation.

*Jones*, 132 F.3d at 1053.

Thus, the Fifth Circuit follows the more restrictive approach to the First Amendment retaliation cause of action in this context, and this court is, of course, bound to apply that approach. It is important to emphasize, however, that this constitutes a purely *cumulative* obstacle to plaintiff's First Amendment retaliation claims, since he would be unable to recover even if he did make the perceived statements in question. Indeed, it appears to this court that, in *Jones*, there was a much stronger argument than here that the plaintiff would have made any perceived statements in her capacity as a citizen speaking regarding a matter of public interest and that the statements would not have unduly interfered with the employer's operations. Indeed, the Fifth Circuit assumed that the plaintiff could make such a showing in *Jones*. *Id.* In this case, by contrast, the perceived statements by Samsel regarding his principal's decisions regarding the football team are of more tenuous public interest, they were made (if at all) in his capacity as head coach, and, in the case of his alleged statements to the team, they clearly had a great potential to interfere with orderly school and team operations. It is thus, strictly speaking, unnecessary for this court to even address this issue, but it has chosen to do so, partly since, in

light of the circuit split on this issue, it seems possible that the U.S. Supreme Court would wish to address it.

Jones is also significant in a broader sense, since it sets forth a requirement in this circuit that the plaintiff clearly state the nature of the First Amendment-protected activity in which he engaged. This requirement is fatal for plaintiff's First Amendment retaliation claims in this case, since he seems to have adopted a policy of deliberate ambiguity with regard to the specific nature of any protected activity on his part. As noted previously, plaintiff denies having made the derogatory remarks which Gaspard swore he made to the football team, and, with regard to certain other alleged First Amendment activity, plaintiff appears to play rather coy.

For example, in asserting that he engaged in protected activity in "associating" with individuals posting on "social media," plaintiff's briefing seems quite reluctant to state, with any degree of specificity, exactly what those associations were. It is crucial that plaintiff have done so in light of *Jones* and considering also the fact that the First Amendment does not include a "generalized right of social association." *Caleb v. Grier*, 2015 U.S. App. LEXIS 145, *24 (5th Cir. Jan. 6, 2015) (quoting *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1051 (5th Cir. 1996)). Rather, there are only two categories of protected association. *Id.* at *23 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984)). The first category protects "certain intimate human relationships" such as "the begetting and bearing of children, child rearing and education, and cohabitation with relatives." *Id.* at 23-24 (citing *Roberts*, 468 U.S. at 617). The second category protects "association *for the purposes of* engaging in other activities protected by the First Amendment, such as speech or the free exercise of religion." *Id.* at 24 (citing *Roberts*, 468 U.S. at 618) (emphasis added).

Thus, to lead to recovery, any "association" which plaintiff might have had with members of the community posting on "social media" had to have been either intimate familial relationships, or associations which were engaged in *for the purpose* of engaging in First Amendment-protected activity.  In his complaint, plaintiff is quite vague regarding the nature of his "communications" and "associations" with members of the public, merely arguing that:

> H. The Defendant School District removed Plaintiff from his position as head football coach on grounds that he had been communicating with persons who had made postings on social media. Such allegations raise reasonable concerns of a First Amendment violation.  Defendant School District made no reasonable investigation to determine whether this allegation was true before removing Plaintiff as head football coach because of the social media postings;

> I. Plaintiff had a First Amendment associational and speech right to communicate with other citizens who made, unbeknownst to Plaintiff, make postings upon social media. This First Amendment right was violated by Defendants removing Plaintiff as head football coach on the sole ground that he had caused postings to be made on social media critical of Defendants;

In his summary judgment briefing following discovery, plaintiff likewise fails to offer specifics regarding exactly what First Amendment-protected acts of "association" he engaged in with individuals "posting on social media."

In one portion of his briefing, plaintiff appears to "hint" that his associations may have been of a substantive nature regarding school operations.  At the very least, plaintiff appears to argue in favor of his right to engage in such associations, including by sharing information regarding school operations with "social media posters."  Specifically, plaintiff writes in his brief that:

> Logically, the place where the social media posters obtain their information is from school employees.  Without employees who are willing to speak to ordinary citizens about the operations of the public schools, the public, which owns the schools, is not able to comment upon their efficient operation, or to encourage

decisions that would be in the interest of the citizens.

[Plaintiff's brief at 20]. In the court's view, this argument comes dangerously close to plaintiff admitting that he was doing exactly what Killough believed that he was doing, namely feeding derogatory information about her to influential members of social media, in order to rally support against her and to save his own job. Moreover, while plaintiff makes a coherent public policy argument for allowing employees to "communicate" with members of "social media" (and presumably formal media as well), the crucial fact is that the U.S. Supreme Court, as evidenced by decisions such as *Garcetti* and *Pickering*, does not appear to agree with that policy argument. In these and other decisions, the Supreme Court has adopted an approach which supports the right of public employers to restrict their employees' public speech on workplace matters. This court therefore strongly doubts that the Supreme Court would agree with plaintiff's public policy arguments in support of his First Amendment rights, in any employment context.

Even assuming that there are some professions where plaintiff's public policy arguments might have appeal, this court does not believe that the coaching profession is one of them. In so concluding, this court notes that dealing with the public and the media is an integral part of a head football coach's job. That being the case, an employer has every right to control the manner in which the coach interacts with the media and the public regarding school and team matters. For example, an employer has the right to expect that a coach will present a positive image of the program and that he certainly not use his position to campaign against his superiors.

This court also believes that plaintiff's recommended approach would cause severe disruptions between coaches and school administrators. That is, if plaintiff's ideal approach were the law (which it is not), then it would seem to provide incentives for coaches who feel that

they are about to be fired to rally support on their own behalf on social media, internet message boards, and similar forums. Such insubordination might prove successful, and, even if it did not, it might well give rise to a valid First Amendment retaliation claim, if plaintiff's approach were the law. Under the actual applicable law, it seems clear that *Garcetti* and *Pickering* would not permit coaches to make such public statements in their own name, and this court can discern no good reason why the law would permit them to do so through sympathetic fans either. Indeed, it is worth noting that, in this case, plaintiff's interest in alleged First Amendment activities such as "associating" with social media "posters" opposed to the OBHS administration seems to have coincided with his belief that he was about to be fired. Prior to that time, plaintiff seems to have been content to simply coach the football team. This raises questions whether plaintiff was, as he suggests, trying to make valid points of public interest, or whether he was simply seeking to save his own job. The latter frankly seems far more likely, assuming that he actually engaged in these associations (which he does not admit).

If plaintiff did seek to rally support among members of the community, then such would be unsurprising to this court, on a human level. Indeed, plaintiff had good reason to believe that Killough planned to fire him, and it would be understandable, on a human level, if he decided that he had little to lose at that point and that he should "go out swinging" by attempting to rally public support on his own behalf. From a legal perspective, however, agitating against a more senior school official in such a manner constitutes simple insubordination, and recovery for any such conduct is barred by decisions such as *Williams*, *Teague*, *Garcetti* and *Pickering*.

At any rate, to even properly consider this issue, it is essential that plaintiff state exactly what sort of associations he had with members of social media. Plaintiff cannot have his cake

and eat it too on this issue. It seems likely to this court that, if plaintiff believed that he could

recover by being more forthcoming regarding the nature of his associations with members of

social media, then he would have done so. In lieu of offering specific allegations, much less

proof in this regard, plaintiff offers a plainly meritless argument that he is entitled to seek

recovery on the basis of things which members of the public might have said. Specifically,

plaintiff argues in his brief that:

> Refusing to allow Samsel to complain about the violation of the First Amendment
> rights of those citizens making the social media posts is, essentially, an argument
> that he lacks "standing." "Standing" is a doctrine that ensures a plaintiff has "an
> interest in the suit personal to himself." *Tyler v. Judges of Court of Registration*,
> 179 U.S. 405, 406 (1900). It is based, in part, upon the notion that "courts should
> not adjudicate [third-party's] rights unnecessarily because . . . the holders of those
> rights [may] not wish to assert them,. . . ." *Singleton v. Wulff*, 428 U.S. 106, 113-
> 14 (1976). ***
>
> The aim of standing is to "assure that concrete adverseness which sharpens the
> presentation of issues upon which the court so largely depends. . . ." *Baker v.
> Carr*, 369 U.S. 186, 204 (1962).
>
> Here, there are no such concerns. The media postings of the statements critical of
> the public schools directly affected Samsel. Samsel was fired because other
> citizens criticized the operations of the public schools. Samsel, and Samsel alone,
> is in a position to complain, since only he suffered a detriment as a result of this
> speech by others.

[Plaintiff's brief at 18-19].

In the court's view, it should be readily apparent that this line of argument cannot

succeed. Permitting a public employee to stand in the shoes of members of the public, for

purposes of a First Amendment retaliation case, would allow him to make a convenient end-run

around the stringent standards applicable to public employees under *Garcetti*, *Pickering* and

similar cases. This would open the door for public employees who would themselves enjoy no

First Amendment right to comment on certain matters related to their own personal job security, to simply "associate" with members of the public and have them do it for them. This strikes this court as being untenable, as a matter of public policy. Public policy considerations aside, standing doctrine involves an inquiry, based upon the Constitution's "case and controversy" requirement, into whether a federal court has jurisdiction to hear a particular case at all. In considering the First Amendment retaliation issues in this case, this court is not concerned with its basic jurisdiction to decide these issues, but, rather, whether triable fact issues exist regarding plaintiff's right to recover against defendants in this case. This inquiry has developed its own extensive body of jurisprudence, set forth in cases such as *Garcetti* and *Pickering*.

This court notes parenthetically that, even if plaintiff could somehow recover on the basis of "social media" posts made by third parties (which he cannot), then his claims would still fail for his failure to specify exactly what social media posts he is talking about. As noted previously, Killough stated in her declaration that she was concerned about postings on the "OB Nation" website, which were critical of her, supportive of plaintiff, and which included information which she had discussed privately with him. These strike this court as being issues of legitimate concerns for any principal, who has a right to expect that those under her authority will not seek to agitate against her with members of the public, for their own professional benefit. While this court offers no firm conclusion as to whether plaintiff actually engaged in such contacts, his arguments appear, as noted previously, to advocate in favor of his right to do so. In the court's view, the fact that plaintiff has chosen to be so vague regarding exactly what First Amendment-protected activities he engaged in personally, strongly suggests that he is aware of his inability to surmount the stringent standards set forth in cases such as *Garcetti* and *Pickering*.

This suspicion is essentially confirmed by plaintiff's reliance upon plainly inapplicable standing doctrine.

In light of the foregoing, this court concludes that plaintiff's First Amendment claims on the basis of his alleged acts of association do not even leave the starting gate, since he has not made the basic showing which would allow this court to apply the *Garcetti* and *Pickering* standards.[5] Given plaintiff's failure to offer proof and arguments in this regard, he may likewise not create triable jury issues by making vague allegations that defendants failed to properly "investigate" their suspicions that plaintiff was involved in efforts to rally support in the community to have Killough fired. Plaintiff is clearly in a position to know exactly what forms of "associations" he had in this case, and he is not in a position to recover against defendants for failing to investigate matters regarding which, even after discovery, he offered only vague allegations.

That brings this court to the final First Amendment claim raised by plaintiff, arising out of statements he allegedly made to Mayor Phillips in a private conversation between them. In his complaint, plaintiff alleges that:

> J. One of the grounds given by Defendant Killough for removing Plaintiff as athletic director was Plaintiff's conversation with the mayor of Olive Branch, Mississippi. During this conversation, Plaintiff discussed with the mayor of Olive Branch the concerns of citizens about the operation of the Defendant School District and, particularly, desires of certain citizens of forming a new school district. To the extent Plaintiff was removed as athletic director because of the conversation he had with the mayor of Olive Branch, Mississippi, his right to free

---

[5]Plaintiff also offers an alternative theory that he had a substantive due process liberty interest to communicate with others on matters of public interest, but he offers no authority on point in support of this argument. It seems clear that the applicable standards in this context are those set forth in the First Amendment, not the Fourteenth Amendment's due process clause. This court will accordingly limit its discussion to the First Amendment context.

speech, guaranteed by United States Constitution Amendment One, was violated.

On this issue, plaintiff's First Amendment retaliation claims are quite unusual in that he claims he "probably" said something very different to Mayor Phillips than Killough believed he said, based on the transcript of the January 13 meeting. As noted previously, Killough made it clear during that meeting that she had heard that plaintiff talked to the mayor as part of his efforts to have her fired:

> MS. KILLOUGH: Good. Also been brought to my attention that you have gone to the Mayor Scott Phillips; that you told him you need me fired, you're ready to start your separate school district. I don't know what I'm doing, I'm an idiot, I should have never been hired.
> MR. SAMSEL: No.
> MS. KILLOUGH: Didn't happen, good.

[Transcript of Jan. 13th meeting at 16].

For his part, plaintiff claims that he said something quite different to Mayor Phillips and that he should be able to recover based upon his (rather equivocal) description of that alleged statement, even though he offers no proof that Killough had any reason to know about it. Specifically, plaintiff testified in his deposition that, at some point before Christmas, the mayor stopped by his office to discuss certain school issues:

> Q. What did you tell the mayor?
> A. I expressed my concerns about the situation and about where our school was.
> Q. As best you can recall, what were the words that you used? Describe it to me.
> A. I'm going to say we probably talked about there had been a push at one time to get some of the Olive Branch neighborhoods back into our school zone. We have a large area of Olive Branch that's being bussed to Southaven to go to school. And there was a push there to, by some of the aldermen to try to have some influence over the school board and the superintendent to try to get some of those areas back to help our school. And we talked about that. And there was also some talk in the community, I think from a lot of frustrated people about the possibility of looking into forming a separate school district for Olive Branch.
> Q. Did you all talk about that as well?

A. As far as there being rumors that some people would like to see that happen, yes. [Samsel depo. at 77-78].

Thus, plaintiff testified that he "probably" told Mayor Phillips about certain issues affecting the school district which had nothing whatsoever to do with Killough's fitness to be principal. As quoted above, however, it was very clearly Killough's concern that plaintiff had called her an "idiot" who should be fired, not that he might have offered a personal opinion on an issue of local concern. In his brief, plaintiff suggests that Killough's statement that plaintiff was "ready to start his own school district" relates to what he told the mayor about the belief among some that Olive Branch should have its own school district. There could conceivably be some truth to this, but there is essentially no way of knowing, since plaintiff offered nothing more than a bare "no" response when given the opportunity to explain his statements to the mayor. However, considering that this particular statement by Killough was included in the middle of accusations that plaintiff had said she was incompetent and should be fired, it seems very clear that her concern was that he was demonstrating a severe lack of loyalty to her. Indeed, Killough stated that she heard that plaintiff had said he was ready to start "his own" school district, which suggests that insubordination was her concern, not the expressing of a personal view on a matter of policy. This court believes that the record very strongly supports this conclusion, and, if plaintiff wanted to make a record otherwise, then he should have spoken up when given a chance to do so.

Citing *Waters v. Churchill*, 511 U.S. 661 (1994), plaintiff argues that "there is a duty of 'reasonable investigation' by a governmental entity whenever there [are] reasonable grounds to believe the speech in question might be protected by the First Amendment." [Plaintiff's Brief at

23].  Even assuming for the sake of argument that *Waters* is applicable here, the fact remains that Principal Killough and plaintiff had a meeting, memorialized in a written transcript, in which she directly confronted him with what she believed he said.  That strikes this court as being the start of a reasonable investigation into what plaintiff actually said to Mayor Phillips.  This inquiry by Killough gave plaintiff an opportunity, and this court believes a duty, to offer more than a simple "no" response, when she clearly expressed her belief that the meaning of that negative response was that he was denying that he made any negative comments regarding her (or had not talked with Phillips at all).

Plaintiff faults Killough for not asking "at that meeting, or any other time, about what was actually said during the meeting with the mayor," but this argument borders on the illogical.  Plaintiff offers no reason why Killough should have cared about his personal conversations with Mayor Phillips, so long as they did not involve attempts to have her fired, which clearly did interest her.  This court notes that, after his meeting with Killough, she offered him an opportunity to submit written clarifications of what he had told her at the meeting.  Plaintiff chose to submit such an addendum with regard to certain issues, but not with regard to the statements which he allegedly made to Mayor Phillips.

Thus, there is no evidence whatsoever that plaintiff's firing was based upon his alleged statements regarding the policy issue to Mayor Phillips, at a time when Killough had already gone on the record as supporting plaintiff's termination based on other reasons, discussed previously.  Indeed, in light of the storm of controversy which was raging between plaintiff and Killough at the time, the notion that she might have wanted to fire plaintiff over his expressing his view on a comparatively dry issue of school policy strikes this court as highly implausible.  If

plaintiff had wished to prove otherwise, then there are clearly ways he could have done so. Most notably, plaintiff could have submitted an affidavit or deposition testimony from Mayor Phillips himself, confirming that the statement was, in fact, made and that he relayed it to Killough or anyone else at the school district. Indeed, that strikes this court as being a fairly obvious step for plaintiff to have taken, if he believed that Phillips would support his version of what he "probably" said.

This court does not find that plaintiff manufactured his testimony about his statements to Mayor Phillips for the purpose of his lawsuit. It does find, however, that if plaintiffs were able to create fact issues based on nothing more than their own self-serving testimony of things which were said in a private conversation whose contents were (as far as the record indicates) not even known to the relevant decision-maker, then they could manufacture First Amendment retaliation claims essentially at will. This court therefore concludes that plaintiff has failed to make the requisite factual showing to support his claims regarding his alleged statements to Mayor Phillips. This court notes that defendants raise other defenses with regard to these statements, including that any such statements to the mayor (which were made on school grounds) would have been speech made by plaintiff in his capacity as a school employee and thus non-actionable under *Garcetti*. This court agrees with this argument, for essentially the reasons stated in defendants' briefing.

Moreover, as noted previously, the *Mt. Healthy* burden-shifting framework includes a version of the "same decision" defense, and this court certainly believes that it would be applicable here, even if the many factual weaknesses in plaintiff's proof on this issue could somehow be overlooked. Indeed, this court considers *Mt. Healthy*'s same decision defense to be

particularly important in cases, such as here, where a plaintiff claims to have made statements after he was aware that his termination was likely imminent. Otherwise, public employees who feel that their jobs are threatened would have every incentive to conveniently "speak out" regarding an issue of public policy, in the interests of saving their jobs. This court therefore concludes that plaintiff's arguments on this issue lack merit, and his First Amendment retaliation claims are therefore due to be dismissed in their entirety.

### Due Process Claims Arising out of Plaintiff's Termination.

This court next addresses plaintiff's due process claims arising out of his termination. In order to state a substantive due process violation under the Fourteenth Amendment, Samsel must show that "(1) that he had a property interest/right in his employment, and (2) that the public employer's termination of that interest was arbitrary or capricious." *Lewis v. Univ. of Tex. Med. Branch of Galveston*, 665 F.3d 625, 630 (5th Cir. 2011). To have a property right, there must be something that gives the employee protections beyond merely being employed, such as a "for cause" provision in the contract. *Lawson v. City of Monroe*, 579 Fed. Appx. 305, 310 (5th Cir. 2014) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)). To satisfy the second element, Samsel must show that defendants' decision was "made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (internal quotations omitted).

As far as procedural due process, the Fourteenth Amendment requires that a local

government not take a person's "property" without due process of law. "Property" within the meaning of the Fourteenth Amendment does not refer merely to an ownership interest in personal belongings, land, or money, but also may include "mutual explicit understandings" of governmental employment. *Perry v. Sinderman,* 408 U.S. 593, 600 (1972).

One has a "property interest" in a benefit when he has a "reasonable expectancy" of obtaining it, derived from some source independent of the United States Constitution, such as state law. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72 (1972). While state law may create a "reasonable expectancy," federal constitutional law determines "whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 9 (1978).

Thus, applicable due process standards require plaintiff to demonstrate, at the outset, that he had a property interest in his employment. In the court's view, the due process analysis in this case is a rather straight-forward one, due to the fact that defendants have submitted written contracts which include a teaching contract, which is clearly applicable to plaintiff's occasional duties as teacher at OBHS, and multiple "supplemental" contracts, which clearly relate to his positions as AD and head coach. As noted previously, plaintiff's supplemental contract expressly permitted him to be removed, upon two weeks' notice, even without good cause. It is undisputed that plaintiff was given this two-week notice. In light of this language, this court concludes that plaintiff lacked a property interest in his coach and AD jobs, within the meaning of the due process clause. Indeed, Judge Davidson reached the same conclusion in a 2013 decision involving similar claims asserted by a public school teacher/head softball coach. *Papagolos v. Lafayette County Sch. Dist.*, 972 F. Supp. 2d 912, 929 (N.D. Miss. 2013).

In seeking to overcome this and similar adverse authority, plaintiff argues in his brief that neither of these written contracts, which he signed, could in fact be the "real" contract between the parties. As to the teaching contract, plaintiff argues that:

> The "teaching" contract, Exhibit "S," under which Samsel was hired as a teacher to teach zero courses could not be the parties' real agreement. According to the Mississippi Constitution, donations of government property are prohibited. Mississippi Constitution § 66. The school district knew that a teacher's contract, whereby "a teacher" was hired to teach no courses whatsoever could not be the real agreement, since it transmitted information to the Mississippi State Department of Education, falsely telling the state department that Samsel was teaching six (6) courses. Public Personnel Report Received from the Mississippi State Department of Education, Exhibit "T."

In so arguing, plaintiff appears to be asserting that the school district made false reports "telling the state department that Samsel was teaching six (6) courses." In the court's view, if the school district made false reports to the state, then this is a matter which may be of concern between the district and the state. For the purposes of this case, however, it seems quite clear that a contract which is labeled a teaching contract does, in fact, relate to the job of teaching. Plaintiff argues that he was "hired to teach no courses whatsoever," but Killough asserted in her affidavit that plaintiff was certified as a history teacher and that she had instructed him to teach a history course that year when Gaspard, who was himself both a coach and teacher, left the school. Plaintiff does not appear to dispute this fact, which seems clear enough from the record. Moreover, plaintiff was not fired as a teacher, but merely transferred to another school within the district (which his contract permitted), and he declined to accept this transfer.

In his brief, plaintiff next argues that the "supplemental" contracts could, likewise, not be the "real" contracts in this case:

Defendants will argue that Plaintiff's one-year contract, Exhibit "R", states only

that he is employed as a "teacher," not as head football coach, and can be "transferred" to other positions. Defendants will contend that the supplemental contracts, Exhibits "S," allow Samsel to be removed as head football coach or athletic director arbitrarily. Yet, evidence in this case establishes that the real understanding was that Samsel was hired as head football coach. Samsel's principal, Kyle Brigance, testified that he "hired Samsel to be head football coach." Brigance depo., p. 17. According to Brigance, Samsel's duties as head football coach required "all day," and there would be too many "moving parts" for him to teach any significant number of academic courses. Brigance indicated that the contract's language is required by state statute, and there would be no ability to change the predetermined boilerplate language of the contract.

[Plaintiff's brief at 13]. This argument does little, if anything, to advance plaintiff's due process claim. Indeed, this court believes that the fact that (according to Brigance) the relevant contractual language is required by state statute actually hinders plaintiff's argument in this context.

In his brief, plaintiff maintains that both the "teaching" and "supplemental" contracts could not be the "real" contracts, based on arguments that they did not reflect his real duties at OBHS. In the court's view, however, the fact that the language of the contracts in question were based on inflexible state requirements explains why they did not, for example, specifically state that they were "coaching" or "athletic director" contracts. Nevertheless, these are the contracts which are (apparently) required by state statute, and this court is bound to respect Mississippi law in this context. In this case, this court has little difficulty in concluding that a "teaching" contract relates to the school's core function of teaching and that the "supplemental" contracts relate to ancillary matters such as coaching athletics.

In his brief, plaintiff offers another argument as to why the "supplemental contracts" could not, in fact, be his "real" contracts:

Furthermore, the supplemental contracts whereby Samsel was allegedly hired "at

46

will" to be head football coach and athletic director were not even executed until August, after Samsel had begun his duties as football coach and athletic director. *Id.*; Affidavit of Samsel. Thus, they could not represent the parties' complete agreement. It is familiar law that "a party may reform a written instrument that does not reflect the true terms of the contracting parties." *Illinois Central Gulf Railroad Company v. R.R. Land, Inc.* 988 F.2d 1397, 1401 (5th Cir. 1993).

[Plaintiff's brief at 14]. Thus, plaintiff argues that the fact that the supplemental contracts were not executed until after he had already begun his duties means that they, much like the "teaching" contracts, could not be the "real" contracts in this case. This court disagrees.

In the court's view, the crucial fact is that the supplemental contracts were executed well before plaintiff was fired as AD and coach, and it seems quite clear that these are the contracts which must form the basis of any argument that his firing deprived him of a property interest. Plaintiff does not even argue that such is the case with regard to the supplemental contracts, conceding that they were at-will contracts. This court notes that it does not strike it as unusual that parties might wish for a particular employer to begin work before a formal written contract has been executed. If a dispute arises between the parties before such execution, then the terms of the contract would presumably be based upon less formal evidence of the parties' understanding with each other. In this case, however, the record includes formal written contracts signed by plaintiff, and this court has little difficulty in discerning that the teaching contract relates to his occasional duties as teacher and that the supplemental contracts relate to his duties as AD and coach.

In his brief, plaintiff next attempts to "piggy back" his due process argument onto his state law malicious interference with contractual relations claim, arguing that:

Most importantly, all Mississippi employees have a "reasonable expectancy" that they will not be terminated because of bad faith malicious interference in their

> employment by another individual. Under the Mississippi law of malicious
> interference with employment, Samsel had a "reasonable expectancy" that he
> would not be removed as football coach because of malicious motives of
> Defendant Killough or anyone else.

[Plaintiff's brief at 15]. Thus, plaintiff attempts to tie the existence of a due process "property interest" to the existence of a claim for malicious interference with contractual relations. As discussed below, this court concludes that plaintiff has no such malicious interference claim in this case, and it is arguably unnecessary for it to address this issue any further. In the interests of being thorough, however, this court notes that plaintiff is arguing "apples" and "oranges" since (as he himself argues in a different section of his brief) a malicious interference claim applies to even at-will employment contracts under Mississippi law, and the primary inquiry in that cause of action is whether the interference is sufficiently malicious. Thus, the malicious interference inquiry is more analogous to factors relevant to the substantive aspect of the due process analysis, not the threshold question of whether the plaintiff had a property interest in his employment.

This court finally notes that plaintiff's argument that he had a subjective expectancy in his continued employment seems particularly inappropriate when made by a football coach. Indeed, this court believes that if there is any job which is not reasonably regarded as consistent with job security (absent a contract providing otherwise), it is that of head football coach. Thus, even if this court agreed with plaintiff's argument that the supplemental contracts bearing his signature could not be his "real" contracts (which it does not), then it would still conclude that he had no reasonable expectation of job security in this case. In light of the foregoing, this court concludes that plaintiff had no property interest in his AD and head coaching positions, and his due process claims fail on this basis. In their briefing, defendants note additional reasons why, assuming such

a property right exists, there was still no due process violation in this case. These arguments include the fact that plaintiff was, in fact, provided with an opportunity to answer the charges against him and that he failed to exercise his right to appeal the decision to fire him. This court agrees with those arguments, but, given the above conclusions, it is unnecessary to delve into this issue any further. Plaintiff's due process claims arising out of his termination will therefore be dismissed.

### Retaliation for Failure to Rehire

This court next addresses plaintiff's argument that defendants violated various federal and state laws (including anti-retaliation laws) by failing to rehire him when the head football coach position at OBHS once again became open during the course of this litigation. This court frankly believes that this claim, which has occupied a very considerable amount of briefing from the parties, is one which should not have been raised at all. As noted previously, Toungett's tenure as head coach lasted only a year, and all parties appear to agree that it was an unsuccessful one. When the head coach position became open again, plaintiff did not formally apply for it, but his attorney did demand that the school district give him his old job back.

As best this court can tell, this is a demand that any plaintiff's counsel could make when a job comes open during the pendency of a lawsuit in which the legality of his firing is being litigated. It is, of course, perfectly appropriate for counsel to make such a demand, and federal anti-discrimination law already contains incentives for the defendant to make the correct response to this demand. In *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982), for example,

the Supreme Court held that an employer charged with discrimination under Title VII can toll the continuing accrual of backpay liability by unconditionally offering the claimant the job previously denied. It is thus apparent that the law already contains incentives for employers who believe that they may have violated the law in firing an employee to correct their mistake.

Having said that, this court believes that, once plaintiff demanded his old job back, defendants had every right to decide that they had lawfully fired him in the first place and that they did not want him to be their head football coach now, any more than they did the year before. Obviously, plaintiff had not prevailed in any of his claims against defendants at the time Toungett was fired, and this court has found in this order that they acted lawfully in removing plaintiff as head coach. By seeking reinstatement while this lawsuit was still pending, plaintiff was essentially asking for defendants to admit that they had made a mistake in firing him in the first place. It strikes this court as entirely understandable that defendants would not wish to make such an admission, and they have every right to defend themselves against this lawsuit. In the court's view, plaintiff made a poor decision, in response to defendants' refusal, by filing an amended complaint which seeks to litigate a number of new claims (and to re-litigate others) arising out of the refusal to re-hire him. In their brief, defendants duly respond to each of these claims, and this court agrees with their arguments in this regard. This court believes that these arguments are essentially overkill, however, since plaintiff's claims clearly lack factual support.

In the court's view, given the extensive "bad blood" which has developed between plaintiff and defendants, and the controversy and division which his tenure engendered in the community, it is entirely understandable that defendants did not want to re-hire him. In so stating, this court notes that, at the time the head football coaching position became open again,

Killough was still OBHS principal, as she remains to this day. Moreover, to state that plaintiff's and Killough's past dealings with each other are not suggestive of a positive working relationship is a gross under-statement. The same is true of plaintiff's relationship with Kuykendall. That being the case, this court would consider it certainly out of step with their prior history if the school board had decided that it was in the district's best interests to have these three individuals work together once again.

Of course, in many employment discrimination contexts, reinstatement to a plaintiff's old job is a valid remedy after a plaintiff has prevailed in the underlying lawsuit. If plaintiff had prevailed in his claims arising out of his termination, then he could have sought such a remedy in this case. In that scenario, plaintiff could have likewise sought back-pay for the full period in which he was denied his old job, and, by previously refusing to rehire him, defendants would not be able to claim the protection of the *Ford Motor* rule. Plaintiff did not prevail in these claims, however, and this court believes that he should not have filed additional claims arising out of defendants' decision not to re-hire him. For these reasons, as well as additional ones stated in defendants' briefing, this court concludes that plaintiff's state and federal claims arising out of the decision to not re-hire him lack merit, and they will therefore be dismissed.

**Tortious Interference With Contract**

We now turn to plaintiff's tortious interference with contract claims against Killough and

Kuykendall, arising out of his termination.[6]  Such a claim "ordinarily lies when a party

maliciously interferes with a valid and enforceable contract, causing one party not to perform and

resulting in injury to the other contracting party." *Levens v. Campbell*, 733 So. 2d 753, 760

(Miss. 1999)(citing *Nichols v. Tri- State Brick & Tile Co.*, 608 So. 2d 324, 327 (Miss. 1992)

(emphasis added).  However, to establish this claim, Samsel must prove that: "1) the acts were

intentional and willful; 2) that they were calculated to cause damages to the plaintiff[] in [his]

lawful business; 3) that they were done with the unlawful purpose of causing damage and loss,

without right or justifiable cause on the part of the defendant; and 4) that actual loss occurred."

*Id.* at 760-761.  A tortious interference with contract claim requires proof of malice. *See Zumwalt

v. Jones Cnty. Bd. of Supervisors*, 19 So. 3d 672, 688 (Miss. 2009).

        While Killough and Kuykendall thus might conceivably be held liable for tortious

interference with contract in performing their official duties if their conduct was sufficiently

malicious, this court concludes that plaintiff has failed to establish genuine fact issues regarding

their liability for such in this case.  In so stating, this court notes that, in support of the notion that

---

        [6]This court notes that, in cases where it has dismissed all the federal claims asserted by a
particular plaintiff, it usually elects to decline to exercise supplemental jurisdiction over the
remaining state law claims and instead dismisses those state law claims without prejudice.
Indeed, it is the general approach in the Fifth Circuit to do so.  In choosing not to do so in this
case, this court notes that this case has already been continued twice, and the second of these
continuances was on defendants' motion and was granted over plaintiff's objection.  There have
thus been delays in this case which can not fairly be attributed to plaintiff, and this court believes
that this is a factor militating in favor of adjudicating the state law claims in this court.
        This court also notes that, as discussed below, defendants invoke a federal statute, the
Communications Decency Act, as a defense to plaintiff's defamation claim.  While the raising of
this defense does not give rise to federal question jurisdiction, it does tend to give the state law
claims in this case more of a federal "flavor" than is typically the case.  Indeed, as discussed
below, the CDA defense in this case raises novel and very important issues which the Fifth
Circuit (if not the U.S. Supreme Court) might well wish to address.

defendants were maliciously trying to have him fired, plaintiff relies largely upon the previously-discussed tape recording of the January 13, 2014 meeting. [Plaintiff's brief at 11], This court has previously given its impression of this tape recording, which it will repeat here:

> Considered in light of these facts, this court does not regard the tape recording of the January 13 meeting as being as damaging as plaintiff contends. In so stating, the court first emphasizes that plaintiff argues in a different section of his brief that the holding of a "show cause" hearing was not only proper but *constitutionally required*. This contradiction is typical of the manner in which plaintiff manages to argue one theory of the case in one section of his brief and then argue something entirely different in another. While this court does not believe that a show cause hearing was constitutionally required, for the reasons discussed below, it does consider it entirely fair and proper that Killough gave plaintiff an opportunity to answer the charges against him.

> This court therefore regards the holding of the January 13 meeting as being a laudable step, and plaintiff's argument that the tape recording supports his claims comes down to the rather subjective evidence of the *manner* in which it was held. In this vein, however, this court notes that the most damaging statements in the recording were made by Assistant Principal Murphy, not Killough. In particular , Murphy's statement to Killough that "[t]hat was a great Oscar you just earned" does tend to cast her in a negative light, since it arguably suggests she was putting on a performance and was not sincere in what she said. That is merely Murphy's (rather unfortunate) choice of words, however, rather than Killough's own description of her intent and state of mind.

> In the court's view, the recording would be stronger evidence of pretext if Killough, and not Murphy, had made the statements at question. Moreover, this court does not believe that the nefarious nature of plaintiff's tactics at the January 13 meeting should be overstated, even if plaintiff's theory of what motivated Killough is correct. Plaintiff's reaction to the accusations made against him at the January 13 meeting was a matter within his control, and, even if Killough was attempting to make him lose his temper, it was ultimately his choice whether he did so or not. Thus, this court does not regard Killough's alleged "performance" (which simply reflects Murphy's characterization of her actions) at the meeting to constitute fabrication of evidence against plaintiff, or similar misconduct.

This court previously accepted this recording as evidence of pretext (albeit not for age discrimination), but it concludes that it falls well short of constituting an independently tortious

act by Killough or Kuykendall.  In so stating, this court simply notes, once again, that the decision to hold the meeting itself was entirely proper, even laudable, and the damaging characterization of Killough's motivations in holding that meeting comes from Murphy's words, not hers.  Moreover, the context of the meeting was that Killough believed, quite reasonably in this court's view, that plaintiff was attempting to marshal support in the community to have her fired.

Once again, Killough had heard reports from one of plaintiff's assistants that he had called her a "bitch" to the football team and that he had encouraged his players to tell their parents that she was trying to "ruin the program that we started."  Based on these and other facts discussed previously, Killough had good reason to believe that she was engaged in a political power struggle with plaintiff and that he was not exactly following the Marquess of Queensberry rules in opposing her leadership.  That being the case, if Killough was hoping that plaintiff might do poorly at the January 13 meeting and lose his temper, then such is hardly surprising, since we are, after all, dealing with human beings in this case.  Given the context of the January 13 meeting, and the aforementioned weaknesses in the tape recording as evidence of malice on Killough's part, this court concludes that plaintiff's proof falls short of establishing that she acted with the mental state necessary to subject herself to liability for malicious interference with his employment contract.

As to Kuykendall, he was not a participant in the meeting, and, as noted previously, Killough testified that he initially counseled in favor of giving plaintiff a chance to stay on as head football coach, after she expressed her intent to fire him as both AD and head coach. Moreover, Murphy's previously-quoted statement in the recording about "the parameters that

Kuykendall put you in" is simply unclear regarding what role the Superintendent might have played in this regard. Indeed, considering that Kuykendall initially recommended not firing plaintiff as head coach, it frankly strikes this court as more reasonable to believe that he attempted to restrain Killough in some manner. The record is simply unclear in this regard, and the crucial fact is that it was entirely proper for both Killough and Kuykendall to evaluate plaintiff's conduct as coach. Indeed, it was their job to do so. That being the case, this court does not believe that the Mississippi Supreme Court would infer the requisite degree of malice on the part of either Killough or Kuykendall based upon Murphy's vague and largely subjective evaluation of the meeting. Plaintiff's malicious interference with contract claims against these defendants will therefore be dismissed.

**Defamation and related claims**

This court now turns to plaintiff's defamation and related claims, asserted against Superintendent Kuykendall. Plaintiff's claims against Kuykendell arise out of a May 21, 2015 email which defendant sent to approximately forty-eight principals of Desoto County schools. In Kuykendall's email, he forwarded an email from School Board Chairman Steve Dodd, which likewise forwarded an email from Todd Abernathy, a math teacher at OBHS. Both Kuykendall's and Dodd's emails expressed strong agreement with the contents of the emails they were forwarding, and Kuykendall's email encouraged his principals to share the email with their staffs. Specifically, Kuykendall's email states as follows:

Principals

> Please share this email with your staff from the Chairman of our School Board.
> As Superintendent I agree with Mr. Dodd 100 percent! Tell your staff they have
> permission to respond at will. We just finished a great school year. Our teachers
> are the best and deserve better than to be attacked on a Facebook page.
> MK

Dodd's email, with which Kuykendall stated he agreed "100 percent," appeared to vouch for

Abernathy's credibility. Specifically, Dodd's email began with this paragraph:

> I spoke with Mr. Abernathy the other night. I have known him for many years and
> have always found him to be even tempered and calm. Two things he was not
> when we spoke. He is representing the feelings of a lot of teachers I fear and they
> are frustrating. He said they have been told not to respond to the DCR posts and
> that bothers me. We have an army of teachers out there who are willing to battle
> the lies and accusations but if they are being told the [sic] cannot respond, then I
> fear we are doing them an injustice.

The email from Abernathy, which was forwarded by Dodd and then Kuykendall, constitutes an

attack on the credibility of Heather Fox, who ran the Desoto County Reform website, which had

been critical of a number of Desoto County school administrators and teachers. Abernathy's

email also set forth his strong belief that district teachers should take a more proactive role in

responding to attacks on social media.

Plaintiff's defamation claims in this case arise out of one sentence in Abernathy's (rather

lengthy) email, which states: "[Fox] attacks Alyson Killough because she fired a football coach

that [sic] refused to go teach his class and stole money from the school." As discussed below,

plaintiff argues, and defendants disagree, that this email clearly refers to plaintiff. In describing

the likely impact of Kuykendall's direction for his forty-eight principals to forward Abernathy's

email to their staff, plaintiff writes in his brief that:

> Killough testified there were eighty-five (85) certified staff members at Olive
> Branch High School alone. (*See* Deposition of Allyson Killough, taken October 2,
> 2015, attached to Plaintiff's Response in Opposition to Defendants' Second

> Motion for Summary Judgment as Exhibit "I," at pp. 54-55.) Thus, Kuykendall
> caused thousands of school district employees to receive the email. There would
> probably not be any more effective way to make the charge of theft public than by
> emailing the charges to all of those employed by the School District.

[Plaintiff's brief at 26-27].

This court agrees with plaintiff's characterization of the proof in this regard. It appears

that the impact of Kuykendall's email is, almost certainly, even greater than these thousands of

school district employees. This is because Kuykendall's email includes clear encouragement for

employees to be more proactive in responding to attacks, and it gives them "ammunition," in the

form of Abernathy's impassioned defense against certain specific attacks on the school district,

for employees to use in doing so. That being the case, it seems highly likely that the contents of

Kuykendall's email were felt even beyond the thousands of school district employees to whom it

was directed. Moreover, this court believes that plaintiff has a quite reasonable argument that,

given the magnitude of the step Kuykendall was taking in forwarding Abernathy's email, it was

incumbent upon him to exercise great care regarding its contents. In his deposition, Kuykendall

testified that, when he first forwarded Abernathy's email, he had not read its contents. Assuming

this is true (and a jury might potentially conclude it is not), then this court believes that a jury

might reasonably find that it demonstrates a reckless disregard on the part of Kuykendall for the

consequences of his own email.

That brings this court to a fact which, it believes, is the most damaging for Kuykendall.

During his deposition, Kuykendall conceded during cross-examination that, when he was

informed of the contents of Abernathy's email he had forwarded, he nevertheless chose not to

take corrective action. Specifically, Kuykendall testified that:

> Q: So you didn't ever make any attempt to correct what [Abernathy] had done here?
>
> A: Well, you know, I'm sure Ms. Killough may have addressed it, but I didn't. I did not.
>
> Q: Did you ask her to?
>
> A: No, sir.

[Kuykendall depo. at 8]. It appears that significant damage control would have been possible in this context, since the email format allows for a correction to be sent to the same individuals who received the initial email. Nevertheless, Kuykendall conceded that he made no efforts to remedy his mistake, even after an unnamed individual called him and read out loud what the email he had forwarded said.

It seems likely that Kuykendall would be entitled to more benefit of the doubt regarding his motivations if he did not have, at least potentially, a personal stake in the disparagement of plaintiff's reputation. In so stating, this court notes that the decision to fire plaintiff as AD and head football coach, which Kuykendall personally authorized, had caused a storm of controversy in Desoto County. Clearly, questions about the wisdom of the decision would not have been eased by the fact that plaintiff's replacement Toungett had, by all accounts, a brief and unsuccessful tenure as head coach. That being the case, a jury could reasonably find that an individual in Kuykendall's position might have decided that a public perception that there was "more to the story" behind plaintiff's firing, and that he may have been a crook, was not an unwelcome one. Certainly, Kuykendall took no steps to correct this impression, even after he was informed of the contents of Abernathy's email. In the court's view, Kuykendall's statement that "I'm sure Ms. Killough may have addressed it, but I didn't" seems to suggest that he subjectively understood the importance of correcting the record in this regard. And yet the

defendant did nothing. It is unclear why Kuykendall would have expected Killough to address this issue, since it was not her mess to clean up.

In Mississippi, a defamation claim requires a plaintiff to prove: (1) a false and defamatory statement regarding the plaintiff; (2) unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or existence of special harm caused by publication of the defamatory statement. *Armistead v. Minor*, 815 So. 2d 1189, 1193 (Miss. 2002). "[T]he threshold question in a defamation action is whether the statement was defamatory because if the statement was not defamatory, little else matters." *Harris v. Lewis*, 755 So. 2d 1199, 1202 (Miss. Ct. App. 1999) (citing *Fulton v. Mississippi Publishers Corp.*, 498 So. 2d 1215, 1216 (Miss. 1986)). The defamation "must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation, or conjecture." *Phillips Brothers, LP v. Winstead,* 129 So. 3d 906, 929 (Miss. 2014) (quoting *Baugh v. Baugh,* 512 So. 2d 1283, 1285 (Miss. 1987)). The issue of whether a statement is defamatory is a question of law. *Lawrence v. Evans*, 573 So. 2d 595, 602 (Miss. 1998); *see also Armistead*, 815 So. 2d at 1194.

In asserting that Abernathy's email does not clearly refer to Samsel, defendants argue in their brief that:

> Samsel asserts that Abernathy's email alleged that Killough terminated him for stealing money and refusing to go to class. It is undisputed, however, that the email did not mention Samsel's name. Rather, Samsel offers nothing other than conclusory speculation that Abernathy was referring to him. Further, the statement is not asserting that Samsel was terminated for stealing money and refusing to go to class, but rather that someone on social media criticized Killough for terminating an unnamed coach for those reasons.

Defendants may certainly argue this point to the jury, but this court has little difficulty in

concluding that there is sufficient evidence that would allow a jury to find that Abernathy's email was referring to plaintiff. Indeed, this court's own "first glance" reading of the email was that it asserted that Samsel had stolen money from the school. Indeed, Abernathy's reference to the unnamed teacher having refused to teach a class seems to fit the facts of this case (since plaintiff refused re-assignment to teach at an alternative school), as does the fact that members of social media harshly criticized the decision to fire him. Moreover, neither Abernarthy nor defendants have cited any other coach to whom the statement might apply.[7] This court believes a very fair reading of Abernathy's email to be that it referred to plaintiff, and it will not preclude a jury from reaching this conclusion.

Defendants next argue that Kuykendall had a qualified privilege to send the email to his principals and that he did not abuse that privilege. It is well established that a qualified privilege applies to a communication made in good faith on any subject matter on which the person communicating has an interest or in reference to which he has a duty to protect a person or persons having a corresponding interest or duty. *Eckman v. Cooper Tire & Rubber Co.*, 893 So. 2d 1049, 1052 (Miss. 2005). Mississippi courts have found the privilege applicable to communications between employers and employees. *Id.* Courts have held that when a qualified privilege exists, a presumption of good faith arises, and a plaintiff must present affirmative evidence demonstrating actual malice to defeat the qualified privilege. *Eckman*, 893 So.2d at

---

[7]Abernathy's testimony at his deposition that he was unaware of whom the "gossip" was about strikes this court as being disingenuous at best. Indeed, the notion that teachers at OBHS might have been "gossiping" about a certain coach having been fired for stealing money from the school without being aware of which coach they were talking about does not pass the "straight face test," at least in this court's mind. Defendants' attempts to incorporate this alleged uncertainty into their briefing does not lend credibility to their arguments in this context.

1049. For its part, however, this court believes that the circumstances of this case, described

above, might allow a jury to reasonably conclude that Kuykendall abused any privilege he

enjoyed to communicate in good faith with school district employees. While the facts of this

case are open to differing interpretations, this court believes that one reasonable interpretation is

that, as evidenced by his failure to correct his mistake in sending the email, Kuykendall was

content to buttress his own reputation at the expense of plaintiff's and that he thereby abused any

privilege he enjoyed in communicating with his employees.

Defendants next argue that plaintiff's defamation case fails for lack of proof of special

damages, which the Mississippi Supreme Court has held is required in cases of *slander*.

Specifically, defendants argue that:

> Merely stating that Samsel stole money is insufficient to constitute defamation per
> se. *Speed v. Scott*, 787 So.2d 626, 632 (Miss. 2001). Therefore, he must plead and
> prove special damages (i.e. "the loss of something having economic or pecuniary
> value") caused by the statement. Miss. R. Civ. Pro. 9(g); *Weible v. Univ. of S.
> Miss.*, 89 So. 3d 51, 65 (Miss. Ct. App. 2011). Samsel admits that he has no
> economic damages from the email and that it has not hindered his current
> employment or ability to obtain other employment. (Samsel Dep., pp. 277- 78).
> Because Samsel has no special damages arising out of the email, he cannot
> establish this element of his claim.

[Defendant's brief at 21]. In response, plaintiff argues that defendants misconstrue the holding in

*Speed*, writing that:

> *Speed* was based on the plurality's finding that the particular allegations of that
> case were insufficient to demonstrate that the plaintiff was being accused of a
> criminal act. According to the plurality: "The only category [of defamation per
> se] that Scott argued was applicable was the one for allegation of a crime. When
> Chief Speed accused him of being a 'thief' for taking papers regarding the
> firemen's training program, Scott says that this implied that he committed a
> criminal act." *Id.* at 633. This case differs from *Speed* because the allegation here
> is that Samsel "stole money from the school." Unlike *Speed*, such conduct is a
> criminal act involving moral turpitude.

[Plaintiff's brief at 31]. This court tends to agree with plaintiff's reading of *Speed*, which suggested that crimes of moral turpitude would be actionable *per se*. This court further tends to agree that the accusation that an employee stole from his school is an accusation involving a greater degree of moral turpitude than, say, shoplifting from a store.

This court believes, however, that there is a more fundamental reason why *Speed*'s holding may be inapplicable in this case: because it only applies to defamation involving the spoken word, i.e. slander. In *Speed*, the Supreme Court explained the rationale of slander's special injury requirement as follows:

> These rules may at first blush seem artificial, but their purpose is obvious enough. Slander is an unusual tort, where mere spoken words become actionable. Everyday life contains risks of sharp words and wounded feelings, but also worse. Brought forward from common law origins is a balancing of the competing interests of one person to speak and another to be free from harm. Part of the balance struck is to require concrete harm before spoken words are actionable.

*Id.* at 632. Thus, underlying *Speed*'s requirement of special damages is an assumption that the communication in question does, in fact, involve slander, as opposed to libel.

In their briefing, neither party addresses the issue of whether electronic communications constitute libel or slander under Mississippi law, and this court is unaware of any authority which answers this question. The answer to this question might depend upon the context. It could be argued, for example, that an anonymous post on a freewheeling internet message board, where messages quickly "scroll off," should be considered more analogous to slander. Nevertheless, this court is rather strongly inclined to conclude, in the absence of authority suggesting otherwise, that an email from a superintendent to forty-eight of his principals, with instructions to pass it on to their staffs, who were in turn advised to speak freely regarding those matters with

members of the public, constitutes far more than the transitory spoken words of everyday life with which the Supreme Court was dealing in *Speed*.  In so stating, this court notes that, in *Speed*, the plaintiff "was resolute that no harm to his reputation occurred."  *Speed*, 787 So.2d at 631.  In this case, by contrast, it seems difficult to believe that at least *some* harm to plaintiff's reputation did not occur, given the exceedingly wide audience of Kuykendall's email.  Moreover, this audience did not just consist of random recipients, but, rather, individuals who were in a position to greatly affect plaintiff's professional reputation.

It seems clear that, if Kuykendall had chosen to send a written letter to a few of his principals, containing the same material set forth in his email, then (if deemed defamatory) it would be considered libel, not slander.  That being the case, it defies logic that an email sent to forty-eight of his principals would somehow constitute a less significant form of communication. In so stating, this court notes that written letters are most typically read and then discarded, while emails tend to be preserved on electronic servers, more or less permanently.  Additionally, such emails are far more easily forwarded to additional recipients than are written letters.  That being the case, it simply does not make sense to require plaintiff's claim regarding Kuykendall's email to include greater proof of damages than if a letter were involved.

Regardless of the label used for Kuykendall's email in this case, this court is rather strongly inclined to conclude that *Speed*'s rationale does not apply.  In so stating, this court notes that, even considering the quite weak proof of damages in *Speed*, four dissenting justices wrote that "[t]he majority's assertions that Chief Speed's words were not sufficient to cause emotional distress are incomprehensible."  *Id.* at 637.  This court understands that the parties have been required to brief many causes of action in this case, and the defamation issues in this case are

difficult ones which would benefit from further research and briefing.  That being the case, this court will simply state, at this juncture, its inclination to agree with plaintiff that no proof of special damages is required in this case to establish basic liability for defamation.  If either party has additional arguments or authority addressing the concerns raised in this order, then they may submit trial briefing on these issues.  This court will duly consider such briefing in ruling upon any motions for directed verdict and in issuing jury instructions.  At this juncture, however, this court concludes that triable fact issues exist regarding plaintiff's defamation claim against Kuykendall, and his motion for summary judgment will therefore be denied, as to this claim.

That brings this court to exceedingly difficult issues in this case arising out of the provisions of the Communications Decency Act ("CDA.").   Under § 230(c)(1) of the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  The statute defines the term "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet ..."  47 U.S.C. § 230(f)(2).  Furthermore, the CDA provides that "[n]o cause of action may be brought and no liability imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

While the CDA clearly provides broad tort immunity to website providers, a Virginia district court noted in a 2012 decision that "[t]here is . . . very little case law regarding the application of the CDA to users.  Therefore, the court must answer the question whether the broad CDA immunity that courts have applied to providers also applies to users, since the

relevant section of the statute discusses both providers and users." *Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446, 449 (E.D. Va. 2012). The Virginia court held that the CDA did, in fact, apply to users, writing that:

> Given the clear language of the statute and the case law regarding providers, the Court finds that this broad federal immunity also extends to users. . . . Accordingly, this Court finds that a person who creates or develops unlawful content may be held liable, but that a user of an interactive computer service who finds and forwards via e-mail that content posted online in an interactive computer service by others is immune from liability.

*Supermedia, LLC*, 884 F. Supp. 2d 446. In so holding, the court expressed very serious reservations about the implications of its holding, writing that:

> Unfortunately . . . Congress has granted providers and users of interactive computer services totally immunity under the CDA. In so doing, Congress has granted anonymous posters on these websites a license to libel people and companies because the people and companies who provide the fora for this content, and the subsequent users of it, are immune from common law defamation suits. This license is clearly subject to tremendous abuse, and the Court has serious misgivings about this Circuit's broad interpretation of § 230 immunity. The prospect of blanket immunity for those who intentionally redistribute defamatory statements could have widespread and potentially catastrophic consequences for individuals and entities alike. Nevertheless, under the CDA the Court's hands are tied.

*Id.* at 453.

In their brief, defendants correctly note that, while there is no binding precedent on point in this context, persuasive authority from other trial courts suggests that, as a general matter, one who forwards an email written by another which contains defamatory statements enjoys immunity under the CDA. *See e.g. Mitan v. A. Neumann & Associates, LLC*, 2010 WL 4782771 at *1 (D.N.J. Nov. 17, 2010) (finding that a person who forwarded an email that contained "unsavory and illegal business practices engaged in by the Mitan family" was shielded by the

CDA for state law libel claim); *Phan v. Pham*, 182 Cal. App. 4th 323 (Cal. Ct. App. 2010) (finding that a person who forwarded an email that accused a doctor of stalking was shielded by the CDA for state law defamation claim).  *See also Charles Novins, Esq., P.C. v. Cannon*, 2010 U.S. Dist. LEXIS 41147, *7 (D.N.J. Apr. 27, 2010).

This court certainly shares the reservations expressed by the Virginia district court in *Supermedia*, since granting broad immunity to "users" in this context has an obvious potential to eviscerate state defamation law.  Indeed, the act of logging onto a computer (or smart phone) and sending an email is a trivial one, in which, this court believes, most people in this country engage on an almost daily basis.  One the other hand, the importance of being able to vindicate one's reputation through the defamation cause of action has ancient roots in the law.  Why the simple act of forwarding an email, even if it is known to be false and defamatory, should trump this hallowed right is not at all clear to this court.  This court suspects that few individuals are aware of the authority holding that blanket immunity exists for the forwarding of emails; indeed, its own first impression of defendants' argument was that it simply could not be the law.  And yet it does appear to be the law, at least as the general rule applied by several trial courts.

It seems likely that, if upheld as the law by appellate courts, more and more individuals will become aware of the broad immunity offered by the CDA and seek to abuse it.  It should not be difficult for them to find ways to do so.  It strikes this court that, under a broad interpretation of the CDA, an individual wishing to defame another with impunity would not even require the assistance of a third party to do so.  To the contrary, this court takes judicial notice of the fact that the internet offers innumerable means by which one may make anonymous posts and emails, including (but certainly not limited to) throw-away email accounts, anonymous message boards,

proxy servers, and internet cafes. Considering these tools, it should not be difficult for an individual possessing even minimal tech saavy to make an anonymous post or email defaming another and then forward his own post or email to a targeted audience, under the guise of a "look what I read on the internet" email. Indeed, it is unclear why an intelligent defamer would operate in any other manner, and it suspects that more and more individuals will come to realize this. Perhaps some protections exist in this regard that this court is overlooking, and, if so, then Kuykendall may bring it to its attention in his trial briefing. Under this court's current understanding of these issues, however, a broad application of the CDA seems likely to negate much of defamation law which has existed for centuries.

That brings this court to facts in this case which, it believes, might distinguish it from this (apparently) general rule. As emphasized by plaintiff in his brief, Kuykendall was in a position to have unique knowledge about the genuine reasons for his termination. As such, this court believes that there is a potentially strong argument that, when Kuykendall forwarded Abernathy's email to virtually the entire school district, he was *adding* defamatory content beyond that asserted by the original email. True enough, Kuykendall merely forwarded words written by Abernathy, but, without question, the defamatory impact of those words was far greater when sent by a superintendent who was intimately involved in the decision to fire plaintiff.

In light of the foregoing, this court believes that a jury could reasonably find that Kuykendall's email essentially endorsed and *confirmed* the veracity of the accusations, in the eyes of the reader. As noted previously, Kuykendall expressed "100%" agreement with Dodd's email, which itself vouched for Abernathy's credibility. In his deposition, Abernathy testified that his email was simply referencing "gossip" he had heard at the school, but, when forwarded

by Kuykendall, this court believes that this "gossip" became much more than that. [Abernathy depo. at 11]   Under these circumstances, a jury could reasonably find that Kuykendall implicitly *added* defamatory content to Abernathy's email and that he essentially became a publisher of defamatory material himself, within the meaning of the CDA.   Moreover, even assuming that absolute protection exists in the virtual sphere in this regard, the fact remains that Kuykendall instructed his principals to "tell your staff they have permission to respond at will."   A jury could reasonably find that these words from the superintendent were calculated to have an impact well beyond the virtual realm dealt with by the CDA.   Indeed, as Kuykendall's own words and instructions to his employees, they would not enjoy the protection offered to those who merely forward emails written by others.

In light of the foregoing, this court is inclined to allow a jury to decide the issue of Kuykendall's liability for defamation.   This court will consider any additional trial briefing from the parties in this regard, both as to liability and the manner in which it should instruct the jury regarding the provisions of the CDA.   Indeed, it is unclear to this court whether it should decide some of the issues discussed above itself, as a matter of law, or whether it should have the jury do so.   In addition, depending upon the nature of that briefing and the manner in which the proof develops at trial, it is possible that this court will feel compelled to grant defendant a directed verdict, notwithstanding the inclinations expressed above.   Of course, it is certainly possible that the Fifth Circuit will decide that the CDA provides absolute immunity to Kuykendall in this case. At this juncture, however, this court believes that Kuykendall might well face liability for defamation, notwithstanding the provisions of the CDA.   That being the case, this court is not prepared to grant defendant's motion for summary judgment on the basis of the provision of that

statute.

This court also notes that plaintiff raises a federal substantive due process claim arising out of Kuykendall's email, but this claim clearly lacks merit. Defendants thoroughly rebut plaintiff's claim in their briefing, and this court would simply add that plaintiff relies upon outdated U.S. Supreme Court authority in this context. Specifically, plaintiff relies upon *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), which did, in fact, include language which led some commentators to believe that the Supreme Court might recognize a due process "liberty" interest in one's reputation. However, this notion was dispelled in the Supreme Court's 1976 decision of *Paul v. Davis*, 424 U.S. 693 (1975). In *Paul*, the U.S. Supreme Court, clearly cognizant of the implications of federalizing state defamation law, held that harm to reputation, by itself, is not a deprivation of liberty within the meaning of the due process clause. *Paul*, 424 U.S. at 696.

Professor Chemerinsky notes that, *Paul* notwithstanding, "[d]ue process is required when there is harm to reputation if it is accompanied by a tangible detriment, such as loss of employment." Erwin Chemerinksy, Constitutional Law, § 7.3.3 (5th Ed. 2015). As noted by defendants in their briefing, however, plaintiff had lost his job a year before Kuykendall's defamatory email was sent, and his claims arising out of that email are thus properly regarded as stand-alone defamation claims, which may clearly not give rise to substantive due process claims in light of *Paul*.[8] Plaintiff's attempts to assert malicious interference with contract claims against Kuykendall based on his email fail for similar reasons, which are discussed thoroughly in

---

[8]Even if this were somehow incorrect, this court does not believe that Kuykendall's conduct was of the extreme "conscience shocking" nature which might support a substantive due process claim. *See County of Sacramento v. Lewis,* 523 U.S. 833, 835 (1998).

defendants' briefing.  This court therefore concludes that the proof in this case falls well short of that necessary to establish fact issues regarding Kuykendall's potential liability in this regard, and it finds that plaintiff's defamation claim is the only one for which defendant might face personal liability in this case.

**Conclusion**

In light of the foregoing, this court concludes that plaintiff's federal and state claims arising out of his termination and failure to be rehired lack merit and are due to be dismissed. This court concludes, however, that triable fact issues exist regarding plaintiff's defamation claim against Kuykendall, and defendants' motion for summary judgment will be denied as to that claim.

So ordered, this the 17th day of March, 2017.


**/s/ Michael P. Mills**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**